STATE vs. EDGAR M. WARD.

Androscoggin.   Opinion January 5, 1921.

*Murder. Guilty. Motion to set aside the verdict. Denial. Appeal. Suffi-*
*ciency of evidence to warrant the verdict the only question raised on the*
*appeal.   Verdict sustained.*

In this case Edgar M. Ward was indicted at the October term of the Superior
Court in Androscoggin for the murder of Marie Bernier of Lewiston.

From the evidence in the case, we are of the opinion that the jury was warranted
in finding beyond a reasonable doubt the following facts:

(1)   The corpus delicti.

(2)   That Marie Bernier was poisoned by taking internally sulphate of strych-
nia.

(3)   That the medium through which it was conveyed to her stomach was
whiskey.

(4)   That the whiskey was furnished by the respondent and contained in two
14-ounce bottles called small pints.

(5)   That neither bottle when purchased by him contained any strychnine.

(6)   That one bottle was drunk by several people, one-half by himself and
Mrs. Bernier, without any evidence or effect whatever of strychnia or other
drug.

(7)   That one-half of the other bottle was drunk by the respondent and dece-
dent between six-forty and a little after eight o'clock in the evening without
any poisonous or unusual effect.

(8)   That he alone took another drink—offered to Miss Giroux—a little after
eight o'clock.

(9)   That there was then left in the bottle only two drinks of whiskey.

(10)   That about half past nine he and Mrs. Bernier drank the two drinks
remaining in the bottle.

(11)   That in the bottle that contained these two drinks was deposited a quan-
tity of strychnine that killed Mrs. Bernier in the course of half an hour and
brought the respondent to the point of death.

None of the above facts is in dispute except the kind of poison which caused
the death, and the wood alcohol theory was abandoned. A long contro-
versy arose in the trial as to how long a time it would require to complete
the solution of sulphate of strychnine in whiskey. There was no question,
however, that if sulphate of strychnine was actually mingled with whiskey
that its presence there would be manifest in the form of either solution or

suspension. It would therefore seem entirely immaterial in what form she took the poison. It was enough. It killed her.

We therefore reiterate that the evidence warranted the jury in finding that strychnine was the drug. Accordingly the only question for consideration is, was the jury warranted in finding beyond a reasonable doubt that the respondent through the medium of the whiskey contained in that bottle intentionally administered the fatal drug?

Upon this question the testimony of the respondent can be regarded as of very little value except as it is corroborated by circumstances, probabilities and other evidence, which tend to give it probative force. When any respondent takes the stand in his own behalf, however guilty he may be, he always denies the truth of the offense with which he is charged and asserts his innocence. Otherwise there would be no trial.

In view of the above proven facts, the first important inquiry is: When was the poison deposited in that bottle of whiskey? There can be no reasonable doubt that it was not put in by the seller who took it all from one large bottle. Hence it was not in the bottle when it came into the possession of the respondent. This conclusion seems to be made impregnable from the fact that the whiskey was originally taken from one large bottle, was all drunk by several persons, including about a pint and a half by the respondent and Mrs. Bernier, to within two drinks left in the bottle, without deleterious effect or even suspicion of the presence of any drug of any kind. It therefore follows that the poison was deposited after the contents of the last bottle were reduced to two drinks. If so, either Ward or Mrs. Bernier inserted it. If the above conclusions are correct he and Mrs. Bernier had the exclusive opportunity. He says, however, that he did not see Mrs. Bernier do it, and her exclamation when in convulsions "he has drugged me" corroborates him. If she did not, it follows that he must have done it.

Not only the logic of the case but the evidence points directly to him.

By the process of elimination an analysis of the testimony warranted the jury in finding beyond a reasonable doubt that:

(1)    Mrs. Bernier died from internally taking strychnine that was in the last drink of whiskey she took.

(2)    That the poison was put into the whiskey after it had been reduced to the last two drinks.

(3)    That Mrs. Bernier did not put it in.

(4)    That Ward had the exclusive opportunity to put it in.

(5)    That Ward was guilty of doing it.

(6)    That he did it intentionally.

(7)    That nothing appearing that he did not intend the natural and necessary consequences of his act, namely, the death of Mrs. Bernier, he was guilty of murder.

On appeal by respondent. Edgar M. Ward, the respondent, was tried at the October term, 1919, of the Superior Court for

Androscoggin County upon an indictment charging him with the murder of one Marie Bernier, and the jury returned a verdict of guilty. After verdict and before sentence, the respondent moved that the verdict be set aside. The presiding Justice denied the motion, and the respondent appealed. Motion overruled.

Case is stated in the opinion.

*Guy M. Sturgis*, Attorney General, *and Albert E. Verrill*, County Attorney, for the State.

*Frank A. Morey*, for respondent.

SITTING: CORNISH, C. J., SPEAR, HANSON, PHILBROOK, MORRILL, WILSON, JJ.

SPEAR, J. In this case Edgar M. Ward was indicted at the October term of the Superior Court in Androscoggin for the murder of Marie Bernier of Lewiston. From the evidence in the case, we are of the opinion that the jury was warranted in finding beyond a reasonable doubt the following facts:

(1) The corpus delicti.

(2) That Marie Bernier was poisoned by taking internally sulphate of strychnia.

(3) That the medium through which it was conveyed to her stomach was whiskey.

(4) That the whiskey was furnished · by the respondent and contained in two 14-ounce bottles called small pints.

(5) That neither bottle when purchased by him contained any strychnine.

(6) That one bottle was drunk by several people, one-half by himself and Mrs. Bernier, without any evidence or effect whatever of strychnine or other drug.

(7) That one-half of the other bottle was drunk by the respondent and decedent between six-forty and a little after eight o'clock in the evening without any poisonous or unusual effect.

(8) That he alone took another drink—offered to Miss Giroux—a little after eight o'clock.

(9) That there was then left in the bottle only two drinks of whiskey.

(10) That about half past nine he and Mrs. Bernier drank the two drinks remaining in the bottle.

(11) That in the bottle that contained these two drinks was deposited a quantity of strychnine that killed Mrs. Bernier in the course of half an hour and brought the respondent to the point of death.

None of the above facts is in dispute except the kind of poison which caused the death. A long controversy arose in the trial as to how long a time it would require to complete the solution of sulphate of strychnine in the whiskey. There was no question, however, that if sulphate of strychnine was actually mingled with whiskey that its presence there would be manifest in the form of either solution or suspension. It would therefore seem entirely immaterial in what form she took the poison. It was enough. It killed her. The wood alcohol theory was abandoned.

We therefore reiterate that the evidence warranted the jury in finding that strychnine was the drug. Accordingly the only question for consideration is, was the jury warranted in finding beyond a reasonable doubt that the respondent through the medium of the whiskey contained in that bottle intentionally administered the fatal drug?

Upon this question the testimony of the respondent can be regarded as of very little value except as it is corroborated by circumstances, probabilities and other evidence, which tend to give it probative force. When the respondent takes the stand in his own behalf, however guilty he may be, he always denies the truth of the offense with which he is charged and asserts his innocence. Otherwise there would be no trial.

In view of the above proven facts, the first important inquiry is: When was the poison deposited in that bottle of whiskey? There can be no reasonable doubt that it was not put in by the seller who took it all from one large bottle. Hence it was not in the bottle when it came into the possession of the respondent. This conclusion seems to be made impregnable from the fact that the whiskey was originally taken from one large bottle, was all drunk by several persons, including about a pint and a half by respondent and Mrs. Bernier, to within two drinks left in the bottle, without the slightest deleterious effect or even suspicion of the presence of any drug of any kind. It therefore follows that the poison was deposited after the contents of the last bottle were reduced to two drinks. If so, either Ward or Mrs. Bernier inserted it. If the above conclusions are correct he and Mrs. Bernier had

the exclusive opportunity. He says, however, that he did not see Mrs. Bernier do it, and her exclamation when in convulsions "he has doped me" corroborates him. If she did not, it follows that he must have done it.

Not only the logic of the case but the evidence points directly to him.

There was present with him and Mrs. Bernier that evening from a little after eight until this tragedy happened, a young woman and friend of Mrs. Bernier, by the name of Delia Giroux. Nothing appears from the evidence which indicates that Miss Giroux was biased or prejudiced in her testimony or had any reason to be. The jury had the advantage which we have not of seeing her on the stand, and of observing under a severe cross-examination her character, mentality, tendency to exaggerate or minimize, her prejudice or bias, her disposition to tell the truth or prevaricate, her opportunity to know the facts in respect to which she testified, her appearance and manner of giving her testimony, and from these tests of arriving at an intelligent conclusion as to value and weight of her testimony.

If the jury had the right to test the value of her testimony, and we think it had, it will appear from the evidence not only that Ward had an opportunity to put the poison into the whiskey but that he has prevaricated upon the most vital piece of evidence in the case, the note.

It should be here noted that in all of the details of what occurred on that fatal evening, the respondent in a general way corroborates Miss Giroux as to all that was said and done except as to her testimony which tends to show his guilty acts.

Her evidence shows that Ward had exclusive opportunity to place the poison in the bottle. She says that about nine o'clock Ward and Mrs. Bernier went into the kitchen and he said: "You send her away and I will go." Then she, Mrs. Bernier, came back into the sitting room and he came back, not in the sitting room but to the shelf there and got the satchel and the bottle and the glass, and he went out my sight into the kitchen." Mrs. Bernier was then "on the chair at the foot of the couch." She says he was gone about five minutes. All this time he was by himself in the kitchen or elsewhere out of sight of both the women, having with him his satchel, the bottle containing the whiskey and a glass. This tes-

timony shows ample opportunity, and it goes much further. The inference in view of the proven fact that there was strychnine in the whiskey, is entirely consistent with the conclusion that he took the satchel containing the strychnine, the bottle containing the whiskey and the glass in which to mix the poison and from which to pour it into the bottle containing the whiskey.

This inference is strongly corroborated by the admitted fact that the whiskey in the two bottles, which originally came from the same source was all drunk, except the two drinks left in the bottle which Ward took with him into the kitchen, without producing the slightest unusual effect, and that the next drink proved fatal.

Thus Miss Giroux's testimony on this vital point was overwhelming, if true. We think the jury had a right to determine whether it was true or false, and found it true. The respondent denies that he was in the kitchen or elsewhere alone as above described by Miss Giroux. Otherwise her testimony is undisputed but corroborated as above.

But the most vital piece of testimony in the case is found in a note, written on a single sheet of paper by the respondent and discovered upon his person after he was taken to the hospital on the night of the tragedy. The note reads as follows: "Am deadly sick—think whiskey we have been drinking is made of wood alcohol—Marie I think is dead and I am failing fast—cannot move my legs now —never stole any autos in my life. P. S. Mother if I die I am sorry for all that I have done—father have my watch."

The vital issue upon this point is whether the evidence shows, beyond a reasonable doubt, that this note was written before Ward and Mrs. Bernier took their last drink.

The State claims that the evidence proves that it was. The evidence upon this point comes solely from Miss Giroux, and is of course, denied by Ward.

She says that at about nine o'clock he asked Marie if she had some ink, and filled up his fountain pen, from ink he found in the desk, and then sat down and wrote a note. The conversation that ensued between Miss Giroux and Mrs. Bernier while Ward was writing is significant, if true, in its tendency to conclusively prove the time with respect to whether it was before or after the last drink, that he wrote. Miss Giroux says: "I said to Marie, I says, I think he is writing a letter. I told that in French—I think he is writing so as to give it to you to tell me to go. She

said no." Either this conversation took place or it is a fabrication. It is, however, perfectly natural. If this detail is true, there can be no question as to the time of writing. But there is something further that is significant. She further says, "After he wrote the note he went back to the couch and a few minutes later took out the sheet of paper, placed it upon his knee and wrote some more upon it. A reference to the note proves this to be true. But the respondent claims that all this was done after the fatal dose and after he saw Mrs. Bernier on the floor apparently dead, and felt himself to be in a critical condition.

All the medical men, expert or otherwise, agreed that the distinguishing features of strychnine poison were tonic, meaning continuous convulsions and that these convulsions are produced by touching the patient or by the patient's coming in contact with something himself. Ward says he went to the desk and wrote the note—and does not deny that he filled his fountain pen—after he was numb in his legs but before he had a convulsion and came back to the couch where he had a convulsion and that after that convulsion he wrote the postscript on the note upon his knee. Dr. Haskell, the county medical examiner, and Dr. Scannell, a physician and surgeon of long practice, both declare that after Ward had a convulsion it would have been impossible for him to write; that any movement or anything or even a draught of air would set him into convulsions. On cross-examination by the defense this question and answer appear: "Assuming that he came from the table, writing table, back upon lounge and when he got back there or before leaving, he put the pen in his pocket, he then felt a twitching, he went back to the couch and then wrote upon his knee a note, whether that was possible before the severe convulsion came on?" Answer by Dr. Scannell: "I should think it would be absolutely impossible." No medical witness is called by the defense to contradict this positive testimony. It would therefore seem conclusive that the time of writing the note was correctly stated by Miss Giroux.

She is attempted to be contradicted however by Mr. and Mrs. Bragdon who live in the tenement above Mrs. Bernier to whom Miss Giroux went for assistance when she fully appreciated the serious condition of Mrs. Bernier. They say she placed the time of writing the note after the taking of the final drink.

State's Ex. No. 1

Am deathly sick think
whiskey we have been drink-
ing is made of wood alcohol
Jamie I think is dead and
am failing fast Coming
[illegible] you have
[illegible]
my life
E. M. Ward
Rangeley
Me.

But the jury also saw these two witnesses and had an opportunity to compare them with Miss Giroux and from their verdict must have felt compelled to place full confidence in her story; for upon the awful charge of murder, juries certainly are not prone to conviction except upon ample evidence.

But the note itself which is before the court, a copy of which is here inserted, is very strongly corroborative of Miss Giroux's version of the time of writing.

Upon Ward's own testimony of when and how the note was written, both the physicians above named, Haskell and Scannell, say that his version is impossible. He admits he wrote the postscript after having had a convulsion. After having written the first part of the note he said in answer to the question: "Q. Can you tell us whether on the way back you had any convulsion? A. I think not. I did have a convulsion when I sat down on the couch." Then in respect to writing the postscript he says, "Q. You wrote that on your knee? A. I rather think so; yes." This corroborates Miss Giroux.

It is quite evident from the testimony that not only Drs. Haskell and Scannell were of the opinion that Ward's version of writing the note was impossible, but that a similiar opinion would have been expressed by every other physician who testified in the case. Their descriptions of the symptoms of strychnine poison and the effect of contact in causing immediate convulsions justify this conclusion and were ground for a reasonable and perhaps a wise exercise of discretion on the part of defense in omitting to call any rebuttal to the testimony of Drs. Haskell and Scannell.

Another most significant piece of corroborative testimony is the statement of Mrs. Bernier after she had fallen from her chair and Miss Giroux stood over her offering her help. The testimony is in perfect harmony with what is conceded to have occurred and is shown by the following question and answer: "Q. How? What did she do? A. She threw her arm out and her body was shaking all over. She slid from her chair and I asked her if I could do anything for her, if she wanted me to get some help. She says, No. Be careful. He doped me. Stay with me. It is all I have to say." Ward denies that Mrs. Bernier said anything "about being doped."

Had not the jury a right to pass upon this question? Is not the alleged statement of Mrs. Bernier who had just taken a drink from a bottle from which she had been drinking all the evening and who had been suddenly seized with convulsions, after taking the last drink, in perfect accord with what she or any other sane person would think, and consequently say? This testimony also corroborates Ward's statement that he did not see her put anything into the whiskey and points directly to him as the only one who could have done it, and, as before seen, who had exclusive opportunity.

Another piece of testimony which fits into the structure of proof of Ward's intent is the persistency in which he importuned Mrs. Bernier to drink after he had been in the kitchen alone with the satchel, the bottle and the glass in his possession. Miss Giroux testified that after he came back: He says, "have a drink and I will go. Have a drink and I will go. Kept asking her she should take a drink to make him go." "Q. Did she get up and go out? Yes, because he called her back again."

She and Ward then disappeared from her view in the kitchen and the next she saw of them Mrs. Bernier was rinsing the bottle. As she said, "Then I saw her rinse out the bottle, wash out the bottle."

The rinsing of the bottle is another significant act. Ward told the officers, at first, that he rinsed the bottle, himself, because it was a habit he had acquired from previous experience in tending bar.

We think the jury was warranted in inferring from this testimony that the conception of washing the bottle originated in Ward's mind, and, while weak and sick, and before his mind was able to co-ordinate, he stated what was in his mind to have done, to the bottle, after they had drunk, rather than the fact of who did it; for he did not follow his habit, as Mrs. Bernier washed out the bottle, and there is no pretense that she had acquired any such habit. What plausible reason can be suggested under the circumstances of this case, if normal, that Mrs. Bernier should stop to wash out a whiskey bottle or that Ward should direct her to do so, as the plain inference is he did? There is no claim that the other bottle was rinsed, according to any habit, when it was drained.

It is another significant circumstance that is perfectly consistent with the hypothesis that Ward put the poison in the bottle and directed it to be washed out to remove the evidence of what it had contained; and inconsistent with what would be expected to be done, under usual and innocent conditions.

Ward corroborates all this testimony, except his being in the kitchen alone. He says, "If I'm not going to miss my car, I have got to be going. I says the last car goes at 10.15. I asked Mrs. Bernier if she would have another drink with me before I left. She says, I don't know whether to take it or not. I am sick. I says, you might as well, only enough left there. We will finish it."

Miss Giroux says she heard him say in the kitchen "You send her and I will go. She says, no, I am sick, and then came back into the sitting room." He undoubtedly had this conversation as he says when they first went into the kitchen and before he had drugged the whiskey and then after she came back into the sitting room insisted upon her taking the last drink, and he would go. The only practical difference between her testimony and his is as to where this conversation occurred. The jury believed Miss Giroux, and this evidence of his persisting that she take a last drink was entirely consistent with the hypothesis of guilt.

Another circumstance which has an important bearing and points to the guilt of Ward, was his conduct after the fatal drink. After they came back from the kitchen, "she started to laugh and he laughed." The laugh of these people was of such a character as to startle Miss Giroux, for she said, "don't laugh Marie. Don't make him laugh. That scares me." Then he asked Mrs. Bernier, "You happy, Marie?" A mysterious inquiry. Her unusual appearance excited no apparent surprise or interest in his mind. Was it what he expected and was prepared for?

When she fell to the floor he made no effort whatever to help her. He admits this but excuses himself on the ground that he was sick. Yet he says he went to the table, filled his pen, wrote the note, went back to the couch, took out his fountain pen, adjusted it, and wrote a postscript upon his knee. Did his conduct in a total failure to make any effort or attempt to assist her comport with any standard of innocent human action? If he had no previous knowledge of what was in that whiskey and no previous expectation of her sudden collapse, would not he have rushed to her

assistance if he had strength enough to get there? Or was his conduct entirely consistent with the fact, not only that she was poisoned, but that he knew she was poisoned, and saw before him just what he expected to see, and hence stood aloof from the victim of his guilt?

His conduct again was perfectly consistent with guilt and inconsistent with innocence.

But it is claimed by the defense that the State has not proved where Ward had procured any strychnine. But this claim has little weight in the face of overwhelming evidence that he administered it. Besides it would be a practical impossibility for the State to furnish such proof under the law regulating the sale of strychnine. Our statute provides that the only restraint upon a druggist in selling strychnine is that he shall make a record of the sale and the person to whom it is made. It appears from the testimony that strychnine in different forms is a common drug. It is sold in tablet form for medicine and in powdered form for the extermination of vermin. One-half a grain may produce death. This is a small quantity. It might be obtained by combining the strychnine from several tablets. It might be purchased in powdered form. But to ascertain a sale of this kind might necessitate an inquiry of every drug store in Maine, or it might have been obtained in another State. This defense, however is evidential only.

Proof that Ward purchased the drug, with the other facts, might be evidence of his guilt beyond any question of doubt. The other facts, wanting this one, might be evidence of his guilt beyond any reasonable doubt. The fact of its presence in the whiskey proves *a* purchaser. The fact of Mrs. Bernier's death by strychnine, under the circumstances, we think proves *the* purchaser. It was not necessary for the State to go further.

It is also claimed that no adequate motive was shown. But motive is only one element in the chain of evidence offered for the purpose of proving the commission of a crime. It is not an essential element. A powerful motive may be found upon all the evidence to be inconsistent with guilt. On the other hand there may be ample proof of guilt without any evidence of motive. It is often impossible to prove motive. If the other evidence is sufficient, motive becomes immaterial.

It will be further observed from the testimony, in corroboration of the truth of Miss Giroux's statements, that Ward agrees with her in all the essential details of what was done and said that evening except upon the vital things which point to his guilt as nearly as two persons would be likely to agree who were trying to tell the same story.

It appears with respect to his presence in the kitchen, alone, just before the fatal drink, and the time of writing the note, that Ward was guilty of prevarication. When a person is in custodia legis charged with the commission of a criminal offense, a false statement by him as to a material circumstance, is taken heavily against him. Our court have stated the effect of such testimony in *State* v. *Benner*, 64 Maine, at Page 289, as follows:

"The remark that if the prisoner falsified as to time, it was a circumstance strongly evidentiary of guilt, was not merely unobjectionable, but strictly and accurately correct. Crime is ordinarily proved by circumstantial evidence. Truth is the reliance of innocence. Falsehood is the resort of crime. All true facts are consistent with each other. If the prisoner was innocent, there was no reason for the withholding a true fact. Still less was there for uttering a falsehood. Falsehood is evidence of crime. Every falsehood uttered by way of exculpation becomes an article of circumstantial evidence of greater or less inculpatory force."

By the process of elimination the above analysis of the testimony warranted the jury in finding beyond a reasonable doubt that:

(1)   Mrs. Bernier died from internally taking strychnine that was in the last drink of whiskey she took.

(2)   That the poison was put into the whiskey after it had been reduced to the last two drinks.

(3)   That Mrs. Bernier did not put it in.

(4)   That Ward had the exclusive opportunity to put it in.

(5)   That Ward was guilty of doing it.

(6)   That he did it intentionally.

(7)   That nothing appearing that he did not intend the natural and necessary consequences of his act, namely, the death of Mrs. Bernier, he was guilty of murder.

*Motion overrruled.*