THE STATE, EX REL. SLOVAK, APPELLEE, *v.* HOLOD, JR., APPELLANT.

(Decided November 16, 1939.)

*Mr. Melton Boyd,* prosecuting attorney, and *Mr. Frank L. Danello,* for appellee.

*Mr. Earl Henry,* for appellant.

SHERICK, P. J. The defendant, appellant herein, was twice tried and found by a jury to be the putative father of a child born to the prosecuting witness. A motion for a new trial in the first instance was sustained because of an insufficiency in the charge of the court, and the verdict returned was against the weight of the evidence. Upon retrial and upon the same evidence a like verdict was returned. Judgment was entered thereon, from which the defendant appeals to this court. Eighteen matters are complained of. Many of the claimed errors are not pressed in brief or oral argument, and are considered as abandoned.

It is, however, urgently insisted that the court erred in its overruling of defendant's motion for a new trial, and in its failure to grant defendant a judgment *non obstante veredicto.* These claims are postulated upon the asserted conclusiveness of the testimony admitted in evidence of an expert serologist who testified that she made what is known to science as the Landsteiner-Bernstein blood group testing of the blood of the mother and child and the reputed father which positively disclosed that the defendant could not be the father of the bastard child. Simmered down to the point of precipitation, and we are speaking of the evidence, the defendant contends that all of the positive evidence in this case which went to establish the proof of paternity, must be held subservient to the negative conclusion of non-paternity as established by these tests.

We are cited to considerable medical literature and to the adjudications of the courts of Pennsylvania, New York, South Dakota and California and particularly to the case of *State* v. *Wright,* 59 Ohio App., 191, 17 N. E. (2d), 428, which have to do with the develop-

ment of blood testing since the turn of the century. We are told that it has the unqualified endorsement of men of medicine; that the result of these tests are not matters of expert opinion; and that its premise is engrafted upon the certainty of unaltering results always obtainable as evidenced by experimentation in conformity to the principles of the Mendelian law of heredity.

The science of genetics in the light of Mendel's discovery, subsequent experiments, and the microscope, is indeed an intriguing subject. But have the results of these tests now established an immutable law of nature of which courts should take judicial notice? Has it been determined in every instance that certainty of non-paternity was established beyond question of any doubt? If exceptions to the anticipated result of these tests have been found, then courts should be hesitant to hastily adopt the tests as conclusive proof of non-paternity. The report of the committee on medicolegal blood grouping tests of the American Medical Association, as found in Vol. 108, No. 25, page 2139 of The Journal, lists one experimental test which was found mutable.

Without question the secrets of heredity are in part being disclosed by discovery of life's natural laws. It is known that man possesses twenty-four pairs of chromosomes, to which are linked genes, in numbers yet undetermined and whose full part played in the scheme of the laws of heredity are as yet undisclosed. The tests, or the ends sought thereby, are manifested in the propensity of certain types of blood to clump when contacted with certain serums. There results a coagulation of red blood corpuscles. It is also known that there are certain people described as "bleeders" whose blood fails to coagulate like that of normal persons; an example of this class is found in the family of the deposed king of Spain. This trait of character

is transmissible to the male offsprings of a family. It is hereditary. Yet we find no report of blood testing of people belonging to that class. This engenders the query: will their blood react in the same uniformity?

There is a further aspect to be considered, which is, the certainty or uncertainty of the results obtainable by these tests. It 'is established with definiteness that hybrids appear among plants and animals. They are visible to all who will read and see. They undoubtedly occur in humans. Will the blood of hybrids so react? It is also known that mutations occasionally appear. No known reasons can be given for these appearances, unless it is to be found in the unnatural union of the determiners that transmit inheritable characteristics; yet they do appear as is evidenced by the sudden phenomenon in the origin of the breeds of merino and ancon sheep, which disturbs and refutes in part, nature's law that "like begets like." If misunion of genes can create new species when natural selection is permitted as well as when breeding is controlled, it is possible that the three allelomorphic genes, A, B, and O may appear at times in unnatural combinations. Perhaps this was the cause of the unexplainable instance previously noted by the medicolegal committee. And it is possible that further discoveries may be made of linkage among determiners, or of dominant and recessive characteristics that may modify experimental results.

Defendant's counsel argues that the newness of blood testing experimental proof should not induce its rejection as conclusive evidence of non-paternity. That truth is not susceptible of refutation. The real test of course lies in its absolute correctness. Defendant reasons in his brief that "the law of gravitation was just as reliable and effective an hour after it was discovered as it is today many centuries later." The scrivener, however, fails to note that Einstein's mathe-

matical calculations have conclusively established the incorrectness of Newton's theory that objects fall in straight lines. We now know that they follow geodesic lines. Hence there fell by the wayside one of those laws of nature, long held immutable, which courts perhaps have judicially noticed and applied as conclusive.

Our observations made prompt us to the view that the negative proof of impossibility of paternity, as disclosed by the absence or presence of substances, A, B, and O, or M and N, in the blood, should not be conclusive proof of that fact. It presupposes absolute honesty in the experimenter as well as positive ability. It wipes out all chance of innocent mistakes. It assumes that serums are fresh and that blood tested is of proper age or consistency. It transgresses upon the usual rule that positive evidence is ordinarily of greater weight than negative proof. It may brand many honest women, who have committed one indiscretion, with promiscuity and as liars. It is not our purpose to lend aid and comfort to the old practice of exhibiting the new-born babe for speculative and fancied likeness to its reputed father. We simply find that blood test expert evidence of non-paternity may be unreliable, but in view of its correctness in many cases, is admissible, as was held in the *Wright case, supra,* "for whatever weight it may have to prove the non-paternity of the alleged father." We believe this is entirely consistent with the provision of Section 12122-1, General Code, recently enacted, which provides for the admission in evidence of blood tests in cases where paternity is in issue. It will be noted that this proof is not made conclusive.

The subject may be pursued with enlightenment by a reading of *Arais* v. *Kalensnikoff*, 10 Cal. (2d), 428, 74 P. (2d), 1043, 115 A. L. R., 163. Also *State* v. *Damm*, 62 S. D., 123, 252 N. W., 7, 104 A. L. R., 430.

See also annotations attached to report of these cases in 115 A. L. R., 167; 104 A. L. R., 447.

Two matters of evidence are complained of, one of admission and one of exclusion. The first was a proper matter of cross-examination. It needs no further comment. The second matter pertains to a question propounded to the expert serologist upon direct examination. She was asked if she knew from her knowledge and the experiments if the defendant could possibly be the father of the child. An objection to the question was sustained and properly so. She was next asked if she had an opinion. Plaintiff's counsel made no objection thereto, if the question as modified could be answered by yes or no. The witness said she had no opinion. It appears in the record that the witness testified it was not a matter of opinion, but one of scientific or natural law. She thereafter testified that since the blood of the mother contained substance M, and N was not present, and the child showed the presence of N, it must have received its N substance from its father, and the defendant's blood lacked substance N. It is therefore clear that the evidence offered did finally gain admission. We therefore perceive no error in the exclusion complained of. If this be not true, then the principal question in issue was not before the trial court or this tribunal.

The trial court's refusal to give defendant's special request No. 1 before argument is said to have been prejudicially erroneous. It reads in part:

"As regards the reliability of the results obtained by blood tests, the latest investigations show that although the determination of the blood group affords no positive evidence for a declaration or finding as to who the father of a child is, it does, on the other hand, furnish evidence for the exclusion of this relationship or the determination of non-paternity, when the

child's blood group does not agree according to a definite scheme with that of the supposed father."

If this request had been given it would have placed the court in the position of singling out the testimony of a particular witness and saying to the jury, this is credible evidence, and that "it does * * * furnish evidence for the exclusion of this relationship." It not only would have placed the court in the jury box by a determination of credibility, but it also would have caused the court to express its opinion. The court's province ended when it determined its competency and admissibility, and its subsequent instruction to the effect that it should receive the same weight and consideration, if found credible, as any other evidence pertaining to the issue made.

Defendant's request No. 2 was also refused. It is couched in this language:

"The court further instructs you that if from the evidence you find a blood test has been made, and if you find that the test made is and was an accurate test, scientifically made by a person competent and qualified to make such a test, and if you find from this blood test that the defendant could not be and is not or was not the father of the child, then you should consider that as evidence in determining and passing upon the guilt or innocence of the defendant."

In a bastardy action it is the jury's duty by its verdict to answer a single question; if the defendant is or is not guilty as charged in the complaint, which avers that he is the father of the bastard child.

If this request had been given, the jury would have been told that if it found "from this blood test that the defendant could not be and is not or was not the father of the child," and from this evidence alone, then it could consider such a finding in passing upon the defendant's guilt or innocence. In other words, without weighing all the evidence it might first pass

upon the blood test and find from it that the defendant was not the father of the child, which is the ultimate fact the jury must find, and then if it so found, it might consider that finding in arriving at its verdict. This seems incongruous. If the jury once found that the defendant was not the child's father, surely it would have to be consistent and reaffirm that finding. It must follow that the verdict would have been based upon the sole consideration of the blood test. The request was properly refused.

Defendant's requests Nos. 4, 5, 6 and 7 were also refused. They are declarations from the court, apprising the jury of judicial notice taken by it of certain phases of the moon, and when the sun and moon went down in Guernsey county on the night of the child's conception. The evidence in the case made an issue of which one of two boys, the defendant or another, had had intercourse with the prosecuting witness on the night in question. The defendant sought to create a complete blackout, thereby seeking to establish a doubt as to which boy was the child's father. Its purpose, of course, was to discredit the mother's identification of defendant.

Inasmuch as all the evidence in the case practically concedes this darkness, we are unable to perceive where these charges could have aided the defendant. We think the court, in exercise of its discretion of things judicially noticed, had a perfect right to refuse these requests in view of the fact that proof of these astronomical happenings was not offered in evidence. Such might have been but was not done.

The judgment is affirmed.

*Judgment affirmed.*

LEMERT and MONTGOMERY, JJ., concur.