# HARRY E. SHANKS *v.* STATE OF MARYLAND

## [No. 40, October Term, 1945.]

*Decided December 18, 1945.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*George W. Evans* and *Robert P. McGuinn,* with whom was *Michael F. Freedman* on the brief, for appellant.

*J. Edgar Harvey, Assistant Attorney-General,* with whom were *William Curran, Attorney-General, J. Bernard Wells, State's Attorney for Baltimore City,* and *Bernard G. Peter, Assistant State's Attorney,* on the brief, for appellee.

MARBURY, C. J., delivered the opinion of the Court.

Appellant was indicted in Baltimore City for the crime of rape, tried before the court sitting without a jury, found guilty, and sentenced to be hanged. From the judgment and sentence of the Criminal Court of Baltimore this appeal is taken.

During the course of the trial, evidence was offered of the result of various blood tests, taken by Dr. Freimuth, a toxicologist attached to the office of the Chief Medical Examiner of the State and former toxicologist and serologist of the Federal Bureau of Investigation in Washington. No objection was made to the qualification of Dr. Freimuth, but the admission in evidence of the result of these tests was objected to, and constitutes the basis for this appeal.

Scientific tests of human blood are now almost universally used in appropriate cases and the results are accepted as evidence where they are found to be admissible for the purpose offered in a particular legal proceeding. The possibilities were first brought to the attention of the medical world when Dr. Karl Landsteiner, afterwards a Noble Prize winner, announced in 1900 the result of his experiments showing that all persons, without regard to race, sex or health, could be divided into three blood groups (later increased to four). Other discoveries were made later, and the blood tests now given are generally known as the Landsteiner-Wiener, Landsteiner-Levine or Landsteiner-Bernstein tests. These tests have been recognized by the courts in Europe since 1924, their chief use being in paternity cases. Up to 1929, the tests were said to be used in over 1,500 court cases in Vienna. In Germany, they had been used in over 5,000 cases by 1929. In Great Britain, they were

used in two murder cases as early as 1930 and 1931. The first case in this country seems to have been in 1931. In the early cases evidence of the tests was not admitted, because the courts here were not convinced of their general acceptance and reliability. See *State v. Damm*, 62 S. D. 123, 252 N. W. 7; *Beuschel v. Manowitz*, 241 App. Div. 888, 272 N. Y. S. 165. Blood tests are now accepted everywhere, scientifically, as accurate, and the courts and legislatures have generally followed the same view. The trial courts in this State have so accepted them for a number of years, and the Legislature in 1941, by Chapter 307 of the Acts of that year, specifically provided that such tests could be used in bastardy proceedings. Flack's Annotated Code, 1943 Supp., Art. 12, Sec. 17. The Act provides that the result of the test shall be received in evidence "but only in case definite exclusion is established." Discussions of the general subject may be found in an article by Dr. Flack, Vol. 23, American Bar Association Journal, page 472, in *Wigmore on Evidence*, 3rd Ed., Vol. 1, pars. 165A and 165B, beginning page 616, in an article by Milton J. Vogelhut of the Baltimore City Bar, The Daily Record, November 18, 1935. See also Journal of Criminal Law and Criminology, Vol. 25, p. 198; Yale Law Journal, Vol. 43, p. 651; Oregon Law Review, Vol. 17, p. 177.

Almost all of the reported cases have to do with paternity tests, which are an extension of the ordinary blood tests. The testimony of Dr. Freimuth, in this case, explains the blood grouping in the following words: "There are in the main four major blood groups in the international system of grouping, and they are:

"Group O, in which you will find approximately 45% of the population;

"Group A, in which you will find approximately 42% of the population, and

"Group B, in which you will find approximately 10% of the population, and

"Group AB, in which you will find the remaining 3%."

The paternity tests are based upon further scientific discoveries, that the child of two people having the same blood group cannot be in one of the other blood groups, but if the two parents have different blood grouping, then a different situation arises. The statutes, including the Maryland statute above referred to, generally provide, and the cases generally hold, that blood tests in paternity cases are only evidence in case definite exclusion is established. That means that if the child has blood O, and both the mother and the putative father have blood O, that is no evidence that the putative father is really the father, because 45 per cent. of the population have that same blood. But if the child has blood A and both the mother and the putative father have blood O, then it is evidence to exclude the father, because a combination of two persons both with blood O cannot produce a child with group A.

In the case of *State ex rel. Slovak v. Holod*, 63 Ohio App. 16, 24 N. E. 2d 962, it was held that it was not error to refuse to instruct the jury that the blood test offered in that case showing the impossibility of the paternity of the putative father was conclusive. The evidence was admitted in that case for whatever weight it might have. The jury convicted the accused in spite of the negative proof of the blood test. This case was decided in 1939, and was very severely criticized in an article in the Iowa Law Review, May, 1940, No. 25, page 823, because it was said that the scientific results are absolutely perfect and other testimony should not be allowed to controvert the clear and undisputed scientific fact. However, in the case of *Schulze v. Schulze*, Sup., 35 N. Y. S. 2d 218, decided in 1942, the Supreme Court of New York admitted evidence from blood tests excluding plaintiff as the father of the child, in a divorce action, and stated that it gave full weight to this evidence, citing as precedents three other New York cases, *D'Agostino v. D'Agostino*, 173 Misc. 312, 17 N. Y. S. 2d 905 (annulment case), *In matter of Lentz*, 247 App. Div. 31, 283 N. Y. S. 749 (paternity case), and *In re Swahn's*

*Estate,* Surr. Ct., 158 Misc. 17, 285 N. Y. S. 234. Also in the case of *Hobson v. Hobson,* decided in 1942 by the New South Wales Supreme Court, 59 W. N. 85, a suit was brought by a husband for a dissolution of marriage on the ground of adultery by the wife. The petitioner disavowed the paternity of the child by the marriage. Blood tests showed that he was excluded as the possible father of the child. This conclusion was accepted by the court in spite of the fact that the evidence was insufficient otherwise. But the court also held that the result of tests, showing that the co-respondent could *not* be excluded as the possible father, was insufficient to establish the adultery charged against the co-respondent. In the paternity case of *Arais v. Kalensnikoff,* 10 Cal. 2d 428, 74 P. 2d 1043, the test showed the accused could not be the father of the child. He was convicted and appealed on the ground that the judgment should be reversed because the medical result was conclusive. The court disallowed this claim, and said that it was expert evidence to be given due weight, but was not conclusive. In the case of *Euclide v. State,* 231 Wis. 616, 286 N. W. 3, a blood test was ordered in a bastardy case which showed that the accused should be excluded. The trial court would not admit this blood test, but the Supreme Court reversed the judgment, and granted a new trial in order to give the accused the right to present in proper form medical conclusions based on blood tests.

In the case before us, the prosecuting witness, while going home about 2 o'clock in the morning on December 31, 1944, was seized by someone, beaten, carried into a vacant yard, kept there for some time, was criminally assaulted twice, and then was permitted to leave. The appellant was arrested on the morning of the same day at his home in Baltimore County, police having discovered that he had been in the neighborhood of the crime. At the time of his arrest, an overcoat with blood stains on it was found in his room behind a wardrobe. When asked how he got these blood stains he told the officer that he was in a fight with a colored girl in front of 1603

Edmondson Avenue, and that was how the blood got on his overcoat. The girl was identified as Elizabeth Moore. She was sent for by the police and asked in appellant's presence if she had been in a fight with him. She said she had been beaten up by him and that her nose was bleeding as a result, but denied that she had put certain scratches on his face. Appellant did not say whether the blood came from the scratches on his face or from the colored girl. The prosecuting witness identified appellant as the man who had assaulted her. The motorman of the street car which took the appellant to Govanstown the morning of December 31st noticed that his face was scratched and that he had blood on his overcoat, and there were other witnesses who testified against the appellant and whose testimony tended to show that he was the criminal. The clothes of the prosecuting witness had blood on them which she testified had not been there before the attack, and the doctor at Franklin Square Hospital, who examined her at 4:45 on the morning of the attack, testified that she was bleeding then. A police sergeant found blood on the snow in the yard and also saw the prosecuting witness with blood running into her eyes. The bloody coat of the accused was offered in evidence. Dr. Freimuth made five separate blood tests which showed as follows:

Blood from coat of accused, type O.

Blood from Elizabeth Moore, the colored girl, with whom the accused had a fight, type A.

Blood from the prosecuting witness, type O.

Blood from clothes of prosecuting witness, type O.

Blood from the snow found in the yard, type O.

It is urgently pressed upon us by appellant that the testimony of Dr. Freimuth with respect to the blood found upon the coat of appellant should have been excluded because it was in violation of the constitutional right of the appellant to refuse to testify against himself. It is difficult to say how this contention can be sustained. Clothing is admissible in evidence if it is so connected with a crime as to throw light upon a mate-

rial inquiry in the case. *Ford v. State,* 181 Md. 303, 29 A. 2d 833. In the case of *Allen v. State,* recently decided by this Court, 183 Md. 603, 39 A. 2d 820, 823, the constitutional guarantee attempted to be invoked in this case was discussed at considerable length, and cases from many jurisdictions cited. That was a case where an accused, on a witness stand, was required to try on a hat found at the scene of the crime. This Court speaking through Judge Melvin said, "In passing upon these border-line cases, of which the one at bar is a striking illustration, the test is who furnished or produced the evidence?" In his opinion Judge Melvin also quotes from the case of *Ward v. State,* 27 Okl. Cr. 362, 228 P. 498, the following passage, which shows the distinction between experiments made by the accused in court and experiments made outside of court and testified to by other witnesses: "The difference is this, * * * that when such comparisons and experiments are made outside of court, the evidence thereto falls from the lips of witnesses other than the defendant. The production of such evidence, therefore, and the testimony thereto, is not that of the defendant but of other witnesses; while, on the other hand, if the defendant is required against his objection in open court, in the presence of the jury, to make such experiments and comparisons, no extraneous evidence is required, and the constitutional prohibition is thereby violated." In the case at bar the appellant did not testify. The blood was taken from his coat, and the evidence as to it was produced by another witness. We can find no justification for his contention that his constitutional rights were violated in this respect.

The appellant had made a statement, as we have already shown, that the blood on this coat came there as a result of a fight he had had with the colored girl, Elizabeth Moore. It is true he did not say that the blood came from her, but according to his statement it must have come from her or from him. It was entirely competent for the State to offer evidence to dis-

prove that part of his explanatory and exculpatory state-
ment which might indicate that the blood on his coat
came from Elizabeth Moore. In the murder case of *State
v. Ward,* 119 Me. 482, 111 A. 805, 809, the court said:
"When a person is in *custodia legis* charged with the
commission of a criminal offense, a false statement by
him as to a material circumstance is taken heavily
against him." It necessarily follows that the State can
show that such a statement is false because such falsity
tends to show guilt. *Wilson v. United States,* 162 U. S.
613, 16 S. Ct. 895, 40 L. Ed. 1090; 22 *C. J. S., Criminal
Law,* Sec. 738, p. 1273. The proof offered, that the blood
on the coat was of type O and the blood of Elizabeth
Moore was type A, was admissible for this purpose, and
we find no error in the ruling of the court below, admit-
ting evidence as to these two types of blood.

When it comes to the admission of the result of the
tests of the blood of the prosecuting witness, of the blood
from her clothes and of the blood on the snow where
the crime was committed, a different question is pre-
sented. The evidence shows that all of this blood was
type O, which was exactly the same as that on the coat
of the accused. This, then, was evidence that the blood
on the coat of the accused could have come from the
prosecuting witness, but according to the testimony of
Dr. Freimuth, 45 per cent. of all the population have this
same blood.

Professor Wigmore, in Volume 1 of the Third Edition
of his word on Evidence, paragraphs 31 and 32, pages
418-421, discusses inductive proof as defined by Profes-
sor Sedgwick in his work on logic. He says that if the
potential defect of inductive proof is that the fact offered
as the basis of the conclusion may be open to one or
more other explanations or conclusions, the test for mere
admissibility as distinct from proof must be something
far short of this. He states the requirement for the
lower standard of admissibility as, "Does the eviden-
tiary fact point to the desired conclusion as the hypo-
thesis more plausible or more natural out of the various

ones that are conceivable." Or in a weaker form, "Is the desired conclusion a natural or plausible one among the various conceivable ones." He states that in practice the courts vary between these two, sometimes requiring that the conclusion must be a more probable one than others, and sometimes merely requiring that it must be a probable or a possible one, irrespective of the greater probability of others.

Here the State's case against the accused rests upon his identification by the prosecuting witness as the man who assauted her, plus an accumulation of circumstances tending to corroborate her testimony. These circumstances were: (1) That he boarded a street car near the scene of the crime, a short time after the assault was committed, (2) that he had blood on his coat when on the car, (3) that the blood on his coat was of a type different from that of Elizabeth Moore, with whom he said he had a fight, (4) that the blood was of the same type as that of the prosecuting witness, (5) that the prosecuting witness was bleeding, with blood running into her eyes, and on her clothing, shortly after she was assaulted, and (6) that blood of that same type was found on the snow at the alleged scene of the assault. None of these circumstances, standing alone, would prove conclusively that appellant was the guilty man, but taken together they constitute a chain of circumstantial evidence tending to corroborate the testimony of the prosecuting witness, and to support the inference that the accused was the person who committed the crime.

The objection of remoteness goes to the weight of the evidence rather than to its admissibility. To exclude evidence merely because it tends to establish a possibility, rather than a probability, would produce curious results not heretofore thought of. In this case the fact that the accused was somewhere near the scene of the crime would not, in itself, establish a probability that he was guilty, but only a possibility, yet such evidence is clearly admissible as a link in the chain. Similar evidence has never been questioned as being too re-

mote. That is a question of weight to be determined by the court or the jury.

In 1 *Wharton, Criminal Evidence,* 11th Ed., Sec. 268, p. 332, it is said: "While the mere fact that the accused was present at the scene of its commission, would be of very little weight if nothing more were shown, nevertheless circumstances showing his presence are relevant upon the issue of identity."

In 2 *Jones, Commentaries on Evidence,* 2d Ed., Sec. 726, p. 1356, it is said: "It is not a sufficient objection to evidence otherwise relevant that it is of little weight. * * * The competency of a collateral fact, to be used as the basis of legitimate argument, is not to be determined by the conclusiveness of the inferences it may afford in reference to the litigated fact. It is enough if it tends, even in a slight degree, to elucidate the inquiry, or to assist, though remotely, to a determination probably founded on truth." *Holmes v. Goldsmith,* 147 U. S. 150, 164, 37 L. Ed. 118.

In *Underhill, Criminal Evidence,* 4th Ed., Sec. 15, p. 16, it is said: "In a prosecution built on circumstantial evidence, all circumstances that might serve to clarify the issues or assist in arriving at the truth are admissible, although remote."

This Court said in the case of *Wilson v. State,* 181 Md. 1, 7, 26 A. 2d 770, 774: "It has been held by this Court that the opinions of medical experts are admissible as to the cause which produced, or probably produced, or might have produced, a certain physical condition. The opinion of an expert as to the probability, or even the possibility, of the cause of a certain condition may frequently be of aid to the jury."

In a long line of cases it has been held that articles found on premises of the accused, with which the crime could have been committed, are admissible in evidence, although there is no proof that such articles were actually used. See *Smith v. State,* 182 Md. 176, 186, 32 A. 2d 863; and cases there cited. The case of *Allen v. State,* *supra,* affords a striking illustration of these principles.

There was no positive identification of the accused, such as there was in the case at bar, but the accused was compelled, over objection, to try on a hat found at the scene of the crime, which concededly had been worn by the culprit, whoever he was. This Court said, 183 Md. 612, 39 A. 2d 824, "The prosecution went a step too far in seeking to make the defendant supply a connecting link in the chain of circumstantial evidence against him." The judgment was reversed on the ground that the constitutional privilege against compulsory self-incrimination was violated, but it was assumed that the evidence was otherwise relevant and admissible. It is perfectly clear that the coincidence that the hat fitted the accused (if it did) would not prove ownership. It could doubtless be shown that a hat of that particular size would fit any one of several million human beings. The most that can be said is that the coincidence tends to corroborate testimony that the hat was owned by the accused, which the accused denied. In the case at bar the similarity of blood type tends to corroborate the State's theory that the accused assaulted the prosecuting witness and caused her blood to stain his coat and the snow at the scene of the crime, by showing conclusively that it could have been her blood.

In the case of *Goldstein v. State*, 179 Md. 697, 22 A. 2d 471, 472, approved in *Purviance v. State,* 185 Md. 189, 44 A 2d 474, Chief Judge Bond said, "Probability is the only requirement, however, and here the probability amounts to little short of certainty. And if there was any room for doubt, the decision was one on the weight of the evidence, not on any question of admissibility."

We see no valid objection in the idea that the jury (or the Court in this case) might attach too much importance to the scientific evidence, and might regard it as positive proof. Recently, during World War II, blood banks, as they were called, were accumulated from millions of people for use directly or as blood plasma in transfusions in hospitals and on the battle fields. There could be few people in the country who failed to know

of this, and who did not also understand that when a transfusion was made, it had to be of blood of the same type as that of the patient. Blood types, therefore, are now matters of common or ordinary knowledge. Even were they not, if the jury or judge is told that 45 per cent. of the population have "O" blood, we cannot assume that this statement would be disregarded and not given its proper weight in determining the evidentiary value of the testimony. Judges and juries must be presumed to have average intelligence at least, and no assumption to the contrary can be made for the purpose of excluding otherwise admissible testimony.

If it be suggested that there is an analogy to bastardy cases where blood tests are used only to disprove paternity and where the statute permits testimony as to the result of the test "only in case definite exclusion is established," it must be borne in mind that the courts and the legislation are there dealing with a situation where self-incrimination is involved, and where the non-scientific evidence is often quite unreliable and scientific evidence may be conclusive as to non-paternity. The blood of the accused must be taken to make such a test, and the statute limits the evidence thus given by him to that in his favor. The Maryland statute does not purport to establish a universal rule of evidence, and has no application whatever in other classes of cases. In this way the statute encourages voluntary facts which may be conclusive.

Finding no error, we will affirm the judgment and sentence appealed from.

*Judgment affirmed, with costs.*