Rose, Appellant, *v.* Rose, Appellee.

[Cite as Rose v. Rose, 16 Ohio App. 2d 123.]

124

(No. 1228—Decided December 11, 1968.)

*Mr. John L. Wagner,* for appellant.
*Mrs. Geneva Rose, in propria persona.*

COLE, J. This case originated as an action in divorce. In determining support for the children of the defendant wife, the lower court awarded support for four children, including one child, Karen Rose. The plaintiff contended at the trial, which in effect related primarily to this issue, that Karen Rose was not his child. The lower court found that Karen Rose was issue of the marriage, granted the divorce to the plaintiff husband and provided support be paid by the plaintiff to the defendant for the infant Karen Rose.

The plaintiff, after motion for a new trial was overruled, filed notice of appeal on questions of law and contended that the finding of paternity was contrary to law and against the manifest weight of the evidence; and this is the issue presented to this court.

By virtue of Section 3105.21, Revised Code, the Court of Common Pleas is authorized to make appropriate orders for the disposition, care and maintenance of the ''children of the marriage.'' The issue as to whether Karen Rose was a child of the marriage between plaintiff and defendant was therefore appropriately before the court and required a determination, at least for this purpose, of paternity.

At the hearing, the evidence presented established that Karen Rose was born on October 22, 1966. The parties were married on January 16, 1952, and the divorce was

granted by the lower court on June 30, 1967. The child was, therefore, born during wedlock. There is, consequently, a presumption that such infant was the child of the marriage and legitimate issue.

The basic rules with reference to the determination of paternity were set forth by the Supreme Court in the case of *State, ex rel. Walker, v. Clark*, 144 Ohio St. 305. That portion of the syllabus of this case, which is pertinent at this point, reads as follows:

"2. A child conceived during the existence of a lawful marital relation is presumed in law to be legitimate—a procreation of the husband and wife.

"3. Such presumption is not conclusive and may be rebutted by evidence, which must be clear and convincing, that there was no sexual connection between the husband and wife during the time in which the child must have been conceived. * * *"

Since the child, Karen Rose, was born during wedlock and the presumption is applicable, the burden was on the plaintiff husband to establish by clear and convincing evidence that there was no sexual connection between the parties "during the time the child must have been conceived."

In *Langel* v. *Langel,* 17 Ohio Opinions 2d 63, it is stated, at page 65:

"* * * If the evidence had shown such sexual relation between the plaintiff and defendant, under the pronouncement of the *Walker case*, in our opinion, evidence of blood-grouping tests would not be competent. The only question to be determined was whether the plaintiff and defendant did have such sexual connection. If so, the presumption is that the child is legitimate and there would be no issuable fact for the court to determine. * * *"

In the instant case there is testimony by the wife that she had no sexual relation with any one other than her husband and that they lived together about two weeks after his return from Vietnam. She denied having intercouse with anyone the year he was gone. His testimony was to the effect that he was in Vietnam from March 2, 1965, to March 12, 1966. On his return, he resumed living with his wife

for a short period and admits sexual connection during this period. Presumably therefore some time on March 12, 1966, or within a day or two afterwards there was sexual connection between plaintiff and defendant.

If this was either within or clearly without the period the child must have been conceived, the case would be decided by application of the principles of the *Walker case*. The child, Karen Rose, was born October 22, 1966. Therefore, the first question is: What was the period in which she was conceived. The normal period of gestation is customarily thought of as nine months prior to the date of birth, which would place the time of conception about January 22, 1966, substantially prior to the admitted intercourse and at a period the defendant was not in the United States.

However, the question of when the child was in fact conceived is not disposed of easily.

In *Dazey* v. *Dazey* (1942), 50 Cal. App. 2d 15, 122 P. 2d 308, the opinion analyzes the various modes of determining the period which elapses from conception to birth. There are two methods: one predicated upon the time elapsed from the date of the last menstrual period of the mother, and one predicated upon the date of the fruitful coition. Here, there is no evidence as to the last menstrual period of the mother. Turning to the second method, since in the instant case coition could only have occurred March 12, 1966, or a short time thereafter, we find the following statement quoting medical authority:

"This author also plainly states that if we compute the period from fruitful coition to birth, it varies from 220 days to 330 days. * * *

"The most reliable datum from which to estimate the beginning is the date of fruitful coition, and, reckoning from this day, pregnancy has been found to vary from 220 to 330 days, the average being 270 days. * * *. From time immemorial women have reckoned 280 days, ten lunar months, or nine calendar months, from the first day of the last period as the length of normal gestation, and for practical purposes this may be accepted, because in the major-

ity of cases it holds true, but one must remember and admit the exceptions. * * * ''

In *Silke* v. *Silke*, 325 Mass. 487, 91 N. E. 2d 200, the court says, at page 492:

''* * * That a child may have been begotten seven months before his birth has been sometimes recognized in the decisions. We cannot say that the judge was wrong in finding that the child was begotten after the libellee returned from Ireland. There are numerous decisions in other jurisdictions in which it has been held, in accordance with medical testimony adduced at the trials, that the limits of the period of gestation extend from a minimum of about 230 days to a maximum of 320 days, and in some instances are calculated from the last menstrual period to the date of birth. * * *''

In Webster's Third International Dictionary on page 952 under the words ''gestation period'' appears a tabulation. For man, the average period calculated from the last menstrual period is given as 267 days. The limits are given as 240—313 days.

In the instant case we must assume coitus on the first possible day, March 12, 1966, the day the husband returned to Marion, Ohio, from Vietnam. The child was born on October 22, 1966. The maximum period of gestation if fruitful coition occurred that day would be 224 days or 4 days within the possible period as set forth in the *Dazey case, supra.*

If we assume the last menstrual period to be 25 days prior to March 12, as the court in that case assumes, we have a period of gestation, using this method of calculation, of 249 days, or 9 days within the limits cited in the Webster tabulation.

Therefore, we conclude that it is not impossible the child was conceived by the husband on March 12, 1966. However, the period of gestation is far from the normal or average period and approaches, as above set forth, the outer limits of the possibilities for a normal child. Alone, it is not sufficient in any way to overcome the presumption of legitimacy. However, it does raise a question, not of

possibility, but of probability. The usual period of gestation of 270 days from the time of coition is also the normal period. In V Lawyers' Medical Cyc. 369, at par. 37.2 the author notes the methods for calculating the probable birth date of the child and states that in clinical practice only 4 per cent of women deliver on their due date but 80 per cent deliver within a period of two weeks before or two weeks after. So the bulk of the children are born within a relatively small deviation from the average. Here, however, we find a child born near the limit of possibility for a normal child. Although insufficient to overcome the presumption, nevertheless, this deviation is great enough to have some probative weight.

The hospital records showing the condition of the child at birth were not in evidence nor was the attending physician called.

Dealing with paternity cases where the burden of proof is on the complainant, i. e., where there is no presumption, Schatkin in his book, Disputed Paternity Proceedings, 3 Ed., at page 524, says:

"Therefore, unless it can be satisfactorily explained by competent expert medical testimony, a substantial variation from the normal duration of pregnancy in an affiliation proceeding is an element of suspicion."

There being, therefore, a contention that the child was not conceived on March 12, 1966, but at an earlier date consistent with the normal period of pregnancy, and the existence of a substantial variation from normal if the husband in this case be deemed the father, the issue still remains, was there sexual connection between the husband and wife during the time in which the child *must* have been conceived. Other evidence would, therefore, be competent bearing upon this issue—and a blood test excluding plaintiff as a possible father would be admissible to show that in fact such intercourse did not occur when the child must have been conceived. Such evidence was introduced. The following letter was introduced into evidence by the plaintiff with a stipulation by plaintiff and defendant that it be so introduced without objection by defendant to "either the form or substance of said exhibit."

"William C. Manthey, M. D. 5/10/67
955 Bucyrus Rd.
Galion, Ohio 44833

"Telephone 468-6883

"Re: Wesley Rose Family
Marion, Ohio

"Mr. John Wagner
Galion, Ohio

"Dear Mr. Wagner,

"As per your request blood samples were taken on Geneva Rose [wife], Karen Rose [Infant] and a certified copy of the blood sample of Wesley Rose.

"The following results were obtained:

| | "MAJOR TYPE |
|---|---|
| "Geneva Rose | O |
| Karen Rose | B |
| Wesley Rose | O |

"On the basis of the findings presented it is *absolutely impossible* for Wesley Rose to be the father of the child Karen Rose.

"By strict Mendelian law the father would have to be either of the B or AB type blood.

"I hope this explanation is satisfactory.

"[signed] William C. Manthey MD."

The *Walker case* makes such evidence competent and states in paragraph five of the syllabus:

"The findings and results of such blood grouping tests admitted in evidence are not conclusive of non-paternity but may be considered for whatever weight they may have in proving that fact."

In the evidentiary application of blood tests two different steps are involved:

1. The actual determination of blood types which involves identity of sample, proper testing procedures and the skill of a trained technician.

2. The application of Mendelian laws of inheritance

to the blood types so determined. This involves only the application of a general scientific principle to the specific facts so determined and is essentially syllogistic in form. In this area there can be little room for doubt. In the instant case the blood types of plaintiff and defendant were both O according to the letter; that of the child was B.

In Schatkin's Disputed Paternity Proceedings, 3 Ed., page 167, it is stated:

"It is the establishment of the laws of inheritance of the blood groups and types that is chiefly responsible for the forensic application of the blood test.

"Although it has been known since 1910 that the four blood groups are inherited, it remained for Bernstein in 1925 to expound the correct theory of their inheritance, while the mechanisms of inheritance of the three M-N types was expounded by Landsteiner and Levine, who discovered them. The finally established laws of inheritance are as follows:

"(1) The agglutinogens A and B cannot appear in the blood of a child unless present in the blood of one or both parents."

Thus, since those with blood type O do not have agglutinogens A and B, in the instant case the B factor, which could not be inherited from either the wife or the husband, must have been in the blood of a third unknown person, the actual father, and the plaintiff would be excluded as a possible father.

See, also, the tabular results of these laws set forth in Schatkin, *supra*, at pages 168-192, and in 163 A. L. R. 942; 14 Western Reserve Law Review 115.

In short, once the blood types are ascertained, the laws of inheritance can be applied with almost algebraic exactness to exclude but not to establish paternity.

The serious problem in the use of such tests which primarily results in their nonconclusive treatment by many courts lies not in this step, but in step one: the actual determination of the blood type. Here there exists an area where serious errors may appear, and all authors emphasize the importance of trained technicians and proper testing procedures. The sample must be taken from the proper

people (in one case a substitute or ringer appeared to take the test) ; the samples must be clearly identified and kept separate; proper serum must be used; none of the parties should have had a recent blood transfusion. In short, all proper scientific safeguards to the validity of the test must exist. In *State, ex rel. Steiger*, v. *Gray*, 3 Ohio Opinions 2d 394, which deals at length with the value of such tests, the Juvenile Court of Cuyahoga County states, at page 399:

"In accordance with enlightened judicial acceptance of the high value of blood-grouping tests *properly conducted,* I hold that in the absence of any competent proof that blood-grouping tests establishing non-paternity were not properly made, the results of such tests, *scientifically conducted and objectively made by doctors expert in such field* should be given such great weight by the court that the exclusion of the defendant as the father of the child, follows irresistibly." (Emphasis added.)

Other authorities also give great weight to the results of such test, but all emphasize that the tests must be done scientifically, by properly trained experts and with appropriate safeguards.

See: Schatkin, "Disputed Paternity Proceedings," 3 Ed., 203; *State, ex rel. Slovak, v. Holod,* 63 Ohio App. 16; *Pomainville* v. *Bicknell,* 118 Vt. 328, 109 A. 2d 342; Whitlatch and Marsters, "Acceptance by the Law of Blood Tests as Scientific Evidence," 14 Western Reserve Law Review 115 *et seq.*: *Bailey* v. *Keaton,* 104 Ohio App. 223.

In summary then: The results of applying the laws of inheritance to blood types is exact and has great evidentiary weight, but doubts may exist predicated upon the qualifications of the technician, the identity of the samples, and the proper or improper testing procedures pertaining to the determination of the blood types.

In this instance there is no issue made as to the qualifications, identity of samples or appropriate procedure. By stipulation the letter was admitted without objection to form or substance. The defendant thereby waived all question as to the matters in which serious doubts might intervene—the determination of the blood types. In the absence of such objection, the absence of cross-examina-

tion of the expert, and in the absence of any contradicting medical testimony, the determination of blood types of the two parties and the child must be taken as established. The second step, the application of the laws of inheritance to the blood types, is certain and under these unique facts must be given great weight.

The great weight assigned to this conclusion of non-paternity predicated on blood tests in this case must be considered in conjunction with the deviation from a normal gestation period. Although the 224-day period is within the limits of 220 days set by the citations given above, it borders on the limits of the possible and is within the realm of the improbable.

There was some evidence introduced showing that the defendant wife at least met with and associated with other men. These factors combined with the great weight assigned to the application of the Mendelian principle on test results, stipulated by the parties, leads us to the conclusion that a finding of paternity was against the manifest weight of the evidence.

This was a divorce case involving the issues of divorce, the custody and support of children of admitted paternity, and alimony, as well as the issue of paternity, support and custody of Karen Rose. No error is claimed and none found as to the issues other than the issue of paternity and as to the support and custody of Karen Rose. Following the procedure adopted in *Whitecotton* v. *Whitecotton*, 103 Ohio App. 149, we, therefore, reverse the judgment only to the extent of the single issue of paternity, custody and support of the child, Karen Rose, and the cause is remanded for a new trial for determination by the court of the paternity of the child, Karen Rose, and such further orders with respect to care and custody, if any, as may be appropriate after the new trial is had and such modification, if any, of the lump sum support award as may be indicated.

*Judgment accordingly.*

GUERNSEY, P. J., and SMITH, J., concur.

SMITH, J., of the Sixth Appellate District, sitting by designation in the Third Appellate District.