983 A.2d 1071

**Jermaine Deeric ARRINGTON**

v.

**STATE of Maryland.**

**No. 60, Sept. Term, 2008.**

Court of Appeals of Maryland.

Nov. 17, 2009.

George E. Burns, Jr., Asst. Public Defender (Nancy S. Forster, Public Defender, and Suzanne K. Drouet, Asst. Public Defender, of Baltimore), on brief, for appellant.

Robert Taylor, Jr., Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., of Maryland, of Baltimore), on brief, for appellee.

Argued before: BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, J.

After his conviction for second degree murder, Appellant Jermaine D. Arrington filed a motion for a new trial based on exculpatory DNA evidence pursuant to Maryland Code (2001, 2006 Supp.), Section 8–201 of the Criminal Procedure Article (CP), which the postconviction court denied. We vacate the postconviction court's order because the DNA evidence obtained after his conviction provides a substantial possibility that the jury would have reached a different outcome had this evidence been presented at trial.

## FACTS AND LEGAL PROCEEDINGS

After a jury trial in the Circuit Court for Montgomery County on August 7–10, 1995, Appellant Arrington was convicted of second degree murder in connection with the stabbing death of Paul Simmons. The events giving rise to this appeal began at a birthday party held in the honor of Erica Smith, age 14, at her house in Montgomery County on August 13, 1994. Arrington, Ray Canty, and two other friends arrived at the party around 5:00 to 6:00 p.m. At trial, Lyle Peterson testified that between 10:00 and 10:30 p.m., he, Simmons and a group of his friends came to Erica's house to watch a professional fight on television. At approximately 10:45 to 11:00 p.m., the party began to break up, and Arring-

ton and his friends left the home heading in the direction of their cars.

Erica testified that as the group was departing, someone in Arrington's group bumped into Peterson. Words were exchanged between the two groups and a fistfight broke out involving Arrington, one or two of his friends, and several of Simmons's friends. Ray Davis, a member of Simmons's group, testified that he saw Arrington approach Simmons and stab him in the chest. Erica's younger sister, Tiffani Smith, testified that she saw Arrington pull a knife from underneath his pants leg and that Arrington then "came up from . . . behind [Simmons] and . . . reached out and stabbed him." Peterson testified that he saw Arrington holding a knife before the fight. Simmons later died.

Erica testified that immediately after the stabbing, Arrington made hand motions and said " 'Yeah, nigger, that's right. I shanked you with my butterfly. You don't know who you fucking with. We the Hobart Stars. " Erica's mother, Michelle Smith, testified that she tried to break up the fight and heard Arrington state: " 'we're the Hobart Stars and you don't 'F' with us' " and " 'I shanked you.' " Arrington's group fled the scene, but Arrington and other members of his group were eventually identified through photographs that had been taken by a guest at the party. Arrington was arrested and charged with first degree murder. Montgomery County Police Department Detective Edward Tarney testified that he arrested Arrington on August 15, 1994 in Washington, D.C. Tarney testified that at the time of Arrington's arrest, Arrington's hair was in corn rows, that he had some facial hair, and that he was wearing a dark-colored tank top and gray sweat pants. Erica Smith testified that, at the time of the fight, Arrington "had a bush-type, little Afro type of a hairstyle." Michelle Smith also testified that Arrington had a "bush" hairstyle at the time of the fight.

In addition to hearing from the individuals who witnessed the knife fight, the jury heard testimony from Charles Heurich, a forensic chemist with the Montgomery County Police

Department Crime Laboratory. Heurich testified that he examined several blood stains on Arrington's gray sweat pants. According to Heurich, the stains were "consistent with the blood type of the victim in this particular case, or any other individual with the same blood type" because the blood sample contained the enzyme "PGM 1." Various witnesses testified that Arrington had been wearing gray sweat pants at the party, and Officer Tarney testified that gray sweat pants were seized from Arrington at the time of his arrest.

The defense contended that the witnesses were mistaken in their identification of Arrington as the perpetrator and presented evidence implying that the true perpetrator was Canty. The defense introduced a statement given to the police by Richard Antiguas, a 13–year–old who had attended the party with his father. In the signed statement, Antiguas wrote: " 'I was standing out in front of the house when the guy with the braids took out a knife and stabbed the guy.' " During cross-examination, Lyle Peterson acknowledged that he told police the night of the murder that the stabber was "Ray" who he identified further as the individual with "three plaits, braided strands[.]"

During its deliberations, the jury presented the judge with the following question regarding a handwritten note apparently found on the blood report: " 'The jury has a question regarding the penciled 59 percent next to stain no. 1 on the waste band of the defendant's sweat pants. . . . Does 59 percent of the population have matching PGM 1?' " [1] The judge responded, to the satisfaction of the State and defense counsel: " 'You must rely on your own collective recollection of the evidence in this case.' " The jury convicted Arrington of second degree murder. During Arrington's November 2, 1995 sentencing, he said the following:

> I can't take back what happened that night and I know that I can never bring Paul back. I mean I understand the pain and the sorrow that the Simmons family is going

---

1. This was apparently a handwritten notation on the report marked as a State's exhibit. The 59 percent was not part of Heurich's testimony.

through, especially Mrs. Simmons because me and her had a personal relationship and I always looked to her as somewhat of a guardian to me while I was in school.

When I found out that this was her son that was killed that night, I didn't know how to react. I didn't know how to take it because I knew that I hurt somebody that I cared about and I don't know what I can do or what I can say to let her know how sorry I am for what happened that night, not just to Mrs. Simmons but to her whole family.

\* \* \*

I know I can never bring Paul back. I am sorry for what happened that night, but I beg of you, Your Honor, have mercy on me.

For the family, I am sorry what happened that night. Mrs. Simmons, I beg you please forgive me. I never meant for this to happen. The rest of the family, I am so sorry, but there's nothing I can do. I can't bring him back.

Arrington was sentenced to thirty years of incarceration with five years suspended.[2]

### Petition For Post Conviction Relief For Ineffective Assistance Of Counsel

On July 28, 2000, Arrington filed a Petition for Post Conviction Relief alleging ineffective assistance of counsel because "[c]ounsel failed to have the blood evidence presented in the case tested through a DNA analysis. Petitioner requested that Counsel conduct a DNA test. However, one was never done." Arrington requested a new trial, vacation of the sentencing and/or re-sentencing, a hearing on the Petition for Post Conviction Relief, and such other and further relief as may be required. On September 12, 2001, there was a

---

2. Arrington noted a timely appeal to the Court of Special Appeals ("CSA") and argued that the suppression hearing judge erred in denying his motion to suppress, that the trial court abused its discretion in admitting allegedly hearsay testimony, and that the evidence was insufficient to sustain a conviction. The CSA affirmed the conviction in a September 19, 1996 per curiam opinion.

hearing in the Circuit Court for Montgomery County on Arrington's request. At his hearing, Arrington relayed what he told his trial counsel about the blood on his sweat pants:

> Well, I think it was right before we picked—started having jury selection, and he came to me and said, "We have some bad news," and I'm like, "What is it?"
>
> He's like, "Well, they say they have—they've got blood evidence. They say they have the victim's blood on your clothes. Do you know how it got there?" I said, "No, I don't." I said, "I don't have the victim's blood on my clothes." He said, "Well, this is what they say."
>
> I said, "Well, the only blood I had on my pants is the blood from a female friend that I had sex with." And so, he was like, "So, tell me how that got on your clothes." So, I told him how I had sex with a female and the blood got on my pants, and he was like, "I don't think the jury is going to believe that," and he was like, "It's hard for me to believe." I said, "Well, I'm telling you the truth."
>
> I said, "All we have to do is get a DNA test done." He was like, "Well, we've postponed enough, and I think—I don't think we're able to postpone again," or something of that nature.

Arrington also referenced the jury's note regarding blood evidence. The State's Attorney who tried the case testified that he did not think it was necessary to order DNA testing because so many eyewitnesses testified that Arrington was the attacker and witnesses also testified that he gloated about the attack immediately afterward. According to Arrington's trial counsel, Arrington never asked him to conduct DNA testing. Arrington's counsel testified that Arrington related to him— not on the eve of trial, but "some time earlier"—that the blood on his clothing came from a woman he had sex with, but that Arrington would provide him no further details about said woman. Arrington's counsel explained why he did not request further DNA testing on the blood samples:

> I weighed—the evidence that we had been provided with by the State showed that he had been identified by a

number of eyewitnesses who had ample time to observe him over a long period of time. The evidence also showed that he was at the scene, because there was at least one photograph taken by one of the party participants where he was clearly in the photograph.

A number of the witnesses clearly identified him as being the person who either actually stabbed Mr. Simmons and-or stated that he had stabbed Mr. Simmons with different types of words, either "I cut him" or—I don't recall the various words, but they used various words to describe what had happened.

There was no question that he was at the scene. There was very little—this was not a racial case, in that you had white people identifying African American people. These were African American people at the party, and some of the witnesses were African American as well. There was ample time for them to observe him as well.

First of all, even if additional testing had been done and additional testing excluded the blood on the pants as coming from the victim, it would not have eliminated or minimized the effect of the testimony of all those witnesses who clearly identified him at the scene.

The prosecutor had not done DNA testing. His explanation to me as to the source of the blood was so insubstantial that I was concerned that additional testing might actually show the blood came from the victim.

He did not talk to me about DNA testing at the time. I don't think he knew about DNA testing at the time and understood that DNA testing could show perhaps that the blood actually came from the victim.

I did not want to raise a red flag for the prosecution at that—in the case or heighten that in any way, and for those reasons I didn't pursue DNA testing.

The postconviction court denied Arrington's request for a finding of ineffective assistance of counsel and issued the following ruling from the bench:

[D]efense counsel testified that he, in fact, did discuss the blood evidence with the defendant and that he did consider

the possibility of having the blood tested further but declined to do so—or, made a tactical decision, I should say, not to do so after listening to the defendant's explanation of where the blood came from, which was from a woman that he had had sex with shortly before the murder.

The defendant could not identify the woman other than by her first name, gave defense counsel no better explanation or no opportunity to try and track this woman down, and it was entirely reasonable for defense attorney to not have given much credence to his client's explanation of where the blood came from.

Based on the State's evidence, the defense could have argued that while the blood was consistent, that certainly did not mean that it was from the victim, whereas a DNA test would have been conclusive and most likely have been conclusive against the defendant. That was certainly in the defense counsel's mind when he made his tactical decision.

So, the Court finds that counsel made an entirely reasonable explanation for his failure to seek DNA testing of the blood found on the defendant's sweat pants.

[T]herefore, there was no deficient performance and no ineffective assistance of counsel.

With respect to prejudice, the Court finds the evidence was overwhelming—setting aside the blood evidence, overwhelmingly against the defendant through a number of eyewitnesses, who not only saw him commit the murder but saw him with a knife and heard him indicate that he had, in fact, stabbed the victim.

### Motion To Reopen Postconviction Proceeding

On January 31, 2003, Arrington filed a Motion to Preserve Forensic Evidence and to Conduct DNA Analysis in the Circuit Court. Arrington requested that pursuant to CP Section 8-201 (2001, 2002 Supp.), the court grant his "request to order that the blood stains cut from the sweat pants and a sample of the victim's blood be preserved and that the forensic evidence be released to the Serological Research Institute for

DNA testing." The Circuit Court granted the order on April 18, 2003.

On June 30, 2006, Arrington filed a Motion to Reopen Postconviction Proceeding and for New Trial pursuant to CP Section 8–201 (2001, 2006 Supp.) and Maryland Rule 4–331. This motion was based on the fact that newly discovered DNA testing results conclusively proved that the blood found on Arrington's seized clothing was not the victim's. Arrington claimed that he was "entitled to a new trial because the bloodstain evidence misled the jury into believing that scientific evidence proved his guilt." Arrington also averred that "critical exculpatory evidence was not presented to the jury either because Arrington's trial attorney was ineffective for failing to use the information or because the State failed to disclose the police records." Arrington's Points and Authorities in Support of his Motion for New Trial stated that the DNA test results were material because the eyewitness testimony was unreliable in this case and should generally be considered with caution. Arrington also argued that the bloodstain evidence was inaccurate and misled the jury, citing the following opening statement by the State:

Now, there is more to this case, however, than just the eyewitnesses that you are going to hear from because there is also going to be what is called forensic evidence. And by that, let me specifically say what I mean.

When the defendant was arrested several days later, he was wearing the same clothes that he was wearing the night that the killing occurred. And when he was arrested, the police in examining his clothing realized that there were what appeared to be dried bloodstains on his pants.

And the police seized those pants and had them analyzed and compared to the victim's blood by someone from the crime laboratory. And the person from the crime laboratory will testify and tell you that that blood on the defendant's clothing is the same blood type as the blood that was the victim's blood.

Arrington highlighted the question that the jury asked regarding the notations on the blood report, arguing that this

question "firmly establishe[d] that the jury used the incorrect and misleading bloodstain evidence as part of its deliberations and as a factor in its decision to convict" because "[t]he jury had no reason to even be concerned about the bloodstain evidence, much less ask a question about it, if the jurors accepted the eyewitness testimony as supporting guilt beyond a reasonable doubt."

Arrington also put forth a new ineffective assistance of counsel claim, alleging that his lawyer failed to make use of critical exculpatory evidence contained in various police reports. Arrington stated that "[t]he most significant of the exculpatory reports is a handwritten statement from David Edwards, one of the victim's friends who participated in the fistfight." In his statement, Edwards wrote: "When they started fighting I was standing there for a split second and that's when I saw the dude with the corn rows come across and try to stab Paul and I thought he missed." Arrington also cited his counsel's failure to present a police report dated July 14, 1994 that identified the "Suspect" as "Stabber B/M 18–22 yr, 6'0", 160 corn rows, Black T-shirt some kind of black pants. Possible name of Boo or Ray. Hobart st. gang." Arrington argued that the testimony of Michelle Smith and Erica Smith was suspect because they mentioned the "Hobart Stars" gang in their testimony, but not in their statements to the police. Arrington contended that the absence of the "Hobart Stars" language from the police reports should have been used by trial counsel to impeach the Smiths by showing that at a time closer to the incident, they made no mention of hearing Arrington brag about a gang affiliation. Arrington also challenged Erica Smith's testimony on grounds that she discussed the case with other witnesses. Finally, Arrington cited his trial counsel's failure to cross-examine the State's expert regarding the percentage of the population that possesses the blood type or enzyme at issue in the case.

### *The Postconviction Court's Order And Memorandum Opinion*

After a hearing, the postconviction court issued an order granting Arrington's Motion to Reopen Postconviction Pro-

ceeding as to the DNA evidence, but denying the motion as to the ineffective assistance of counsel claim. The court also denied Arrington's Motion for a New Trial.

*Waiver*

In the Memorandum Opinion that accompanied the Order, the postconviction court first dismissed the State's assertion that Arrington waived any claim based on new DNA testing because DNA testing was available to him at the time of trial:

> The State's assertion that Petitioner waived any claim based on new DNA testing because DNA testing was available to Petitioner at the time of trial is without merit. The State consented to the DNA testing thereby effectively acknowledging Petitioner's right to assert a claim based on the results of the testing. Furthermore, the legislature chose *not* to require that DNA testing be unavailable to a defendant at the time of trial to trigger testing under § 8–201.

(Emphasis in original.)

The postconviction court next turned to the question of whether Arrington was entitled to a new trial as a result of the favorable DNA testing.

*Maryland Rule 4–331*

The postconviction court first engaged in analysis based on the Maryland Rule 4–331(c)(3) standard, which authorizes the trial court to grant a new trial based on newly discovered DNA evidence if:

> the motion is based on **DNA identification testing or other generally accepted scientific techniques the results of which, if proven, would show that the defendant is innocent of the crime of which the defendant was convicted.**

(Emphasis added.)

The court concluded that "[t]he DNA test results clearly do not prove actual innocence standing alone."

*Substantial Or Significant Possibility Standard*

The postconviction court did not stop there; it also analyzed Arrington's claim under a substantial possibility standard.[3] It rejected Arrington's claim under this standard:

The DNA test results clearly do not prove actual innocence standing alone. Nevertheless, Petitioner asserts a new trial should be granted if the newly discovered evidence is material. That is, whether there is a substantial or significant possibility that the verdict of the trier of fact would have been affected by the newly discovered evidence.

\* \* \*

The DNA testing proves conclusively that the victim's blood was not found on Petitioner's sweatpants. However, Petitioner's involvement in the fight itself was never seriously questioned. The blood evidence was in no way key to

---

**3.** The substantial possibility standard was not present in Maryland Code (2001, 2006 Supp.), Section 8–201 of the Criminal Procedure Article (CP) at the time of the postconviction proceeding. The substantial possibility standard was added to CP Section 8–201 in 2008 by the General Assembly, in Chapter 337 of the Acts of 2008, effective January 1, 2009, in a new subsection (c), which provided:

*New trial.*—A petitioner may move for a new trial under this section on the grounds that the conviction was based on unreliable scientific identification evidence and a substantial possibility exists that the petitioner would not have been convicted without the evidence.

The revised statute also added a new subsection (i)(2), with the following new trial provision:

(2) If the results of the postconviction DNA testing are favorable to the petitioner, the court shall:

(i) if no postconviction proceeding has been previously initiated by the petitioner under § 7–102 of this article, open a postconviction proceeding under § 7–102 of this article;

(ii) if a postconviction proceeding has been previously initiated by the petitioner under § 7–102 of this article, reopen a postconviction proceeding under § 7–104 of this article; or

**(iii) on a finding that a substantial possibility exists that the petitioner would not have been convicted if the DNA testing results had been known or introduced at trial, order a new trial.**

(3) If the court finds that a substantial possibility does not exist under paragraph (2)(iii) of this subsection, the court may order a new trial if the court determines that the action is in the interest of justice. (Emphasis added.)

placing Petitioner at the scene of the crime. There is an actual threshold question of whether Petitioner was even wearing the same sweatpants on the night of the murder, as he was when arrested days later. No one actually identified the sweatpants produced at trial as those worn by Petitioner on the night of the murder although witnesses described clothing that matched their general description. Petitioner was wearing the sweatpants when he was arrested in the District of Columbia two days after the party, and it was this clothing that was tested.

Moreover, the forensic chemist testified that the blood found on Petitioner's sweatpants was "consistent with the blood type of the victim in this particular case, *or any other individual with the same blood type.*" On cross-examination, Mr. Heurich admitted **he was only testifying that the blood on the sweatpants was consistent with the victim's blood and he was not testifying that the blood at issue matched the victim's blood.** Further, the 1994 crime laboratory reports admitted into evidence merely indicate that the blood on the sweatpants was consistent with the victim's blood. **The State did not even mention the blood evidence in its closing argument. The Court finds that the evidentiary value of the blood evidence was minimal given the totality of the evidence in this case.** It certainly does not affirmatively exclude the Petitioner as the individual who stabbed Simmons; nor does it give rise to a reasonable inference that would establish his innocence. The Court cannot find that admission of the blood evidence at trial raises the substantial possibility that the outcome would have been different.

The multiple eyewitness accounts are sufficient to validate the conviction even in light of the new DNA evidence. Two witnesses testified to seeing the actual stabbing, one witness testified to seeing Petitioner holding a knife immediately before the stabbing, and two witnesses testified to hearing Petitioner shout he had stabbed the victim. All of these witnesses were subject to vigorous cross-examination by defense counsel. The jury is charged with judging the

credibility of witnesses and determining what weight to give to any inconsistencies.

(Bold emphasis added, italics in original, footnote omitted.)

*Ineffective Assistance Of Counsel*

The postconviction court next dismissed Arrington's ineffective assistance of counsel claim:

Petitioner also claims ineffective assistance of counsel stemming from counsel's failure to use critical exculpatory evidence contained in various police reports, as well as failure to establish the percentage of individuals having the same blood type as both Petitioner and the victim. Petitioner raised ineffective assistance of counsel at his first postconviction proceeding. It is Petitioner's position that a reopening of postconviction proceedings pursuant to § 8–201, *ipso facto* reopens all issues, regardless of any claims of waiver, abandonment or that claims have been fully litigated. Petitioner fails to cite any authority for such a reading of § 8–201. The legislature intended § 8–201 to provide a mechanism for those with claims of "actual innocence" to utilize favorable scientific evidence at any time to prove their innocence. The statute was not designed to open the floodgates of otherwise structured and constricted postconviction law. Nor was it designed to provide a "super-appeal" as an end-run around the entire body of postconviction law. An additional question for the Court is whether it is in the interests of justice to reopen the issue of ineffective assistance of counsel at this juncture.

Petitioner points to trial counsel's failure to utilize exculpatory information contained within certain police reports to demonstrate ineffective assistance of trial counsel. All of the information was known prior to trial, let alone prior to the first postconviction hearing. Petitioner had the benefit of counsel on appeal and failed to raise these issues. Further, Petitioner had the benefit of counsel during his initial postconviction and failed to raise these issues in support of his allegation of ineffective assistance of counsel. Consequently, Petitioner has waived the right to now assert these

claims. Furthermore, it would not be in the interests of justice to reopen the ineffective assistance of counsel claim where, as here, the Petitioner had access to the information complained of prior to his appeal, as well as his first postconviction hearing, and failed to raise these issues in those forums.

### Appeals

On April 5, 2007, Arrington filed an Application for Leave to Appeal ("ALA"), a Notice of Appeal to Court of Special Appeals ("CSA"), and a Notice of Appeal to Court of Appeals under CP Section 8–201(j)(6). The CSA denied Arrington's ALA on January 29, 2008. But, when Arrington requested the CSA to transfer the case to this Court as a direct appeal pursuant to CP Section 8–201(j)(6), it issued the following order directing that transfer:

ORDERED, pursuant to Maryland Rule 8–132 and CP § 8–201(j)(6), that appellant's April 5, 2007 notice of appeal to the Court of Appeals in the above-captioned action is hereby transferred to the Court of Appeals of Maryland; and, it is further

ORDERED that, pending the conclusion of proceedings in the Court of Appeals on the matter being transferred, all further proceedings in this Court are hereby STAYED concerning (a) appellant's April 5, 2007 direct appeal to this Court, (b) appellant's April 5, 2007 application for leave to appeal to this Court.

The questions presented by Arrington's appeal are as follows:

1. Whether a petitioner whose postconviction proceeding has been "reopened" pursuant to CP Section 8–201 due to newly discovered favorable DNA evidence is entitled to introduce additional exculpatory evidence that would constitute grounds for relief separately or in combination with the DNA evidence.

2. Whether the postconviction court erred by denying Appellant a new trial after concluding that the DNA

evidence did not raise a substantial or significant possibility that the verdict would have been different.

## DISCUSSION

### I.

### *Jurisdiction*

As a preliminary matter, the State argues that this Court does not have jurisdiction to review a denial of postconviction relief because (1) the CSA has not granted an application for leave to appeal and the claim is not governed by the direct appeal provisions of the DNA postconviction act and (2) jurisdiction is not appropriate because Arrington did not meet the new trial requirements of Maryland Rule 4–331.

### *Certiorari Jurisdiction*

The State reasons that because the Application for Leave to Appeal was denied by the CSA, there is no additional basis for review. The State cites Maryland Code (2006 Repl.Vol.), Section 12–202 of the Courts and Judicial Proceedings Article (CJP) which states, in pertinent part: "A review by way of certiorari may not be granted by the Court of Appeals in a case or proceeding in which the Court of Special Appeals has denied or granted: (1) Leave to prosecute an appeal in a postconviction proceeding[.]" CJP § 12–202(1). We reject this argument because no writ of certiorari was ever issued in this matter. Rather, the case was transferred to this Court based on the direct review provisions of CP § 8–201(j)(6).

### *Direct Review Under CP Section 8–201*

■ The State next challenges the legitimacy of direct review in this case, contending that CP Section 8–201(j)(6) applies only in limited circumstances which do not apply here. Prior to January 1, 2009, CP Section 8–201(j)(6) read: "[a]n appeal to the court of appeals may be taken from an order entered under subsection (c), (h)(2), or (j)(4) of this section." The statute was revised in 2008 to provide a broader appeal provision, modifying CP Section 8–201 to read as follows:

"[a]n appeal to the court of appeals may be taken from an order entered under this section." CP § 8–201(k)(6). Along with these modifications, the statute added new trial provisions that embodied the "substantial possibility" standard discussed in the preceding section. *See* CP § § 8–201(c) and (i)(2). With the more liberal provision for direct appeal from *any* order entered under Section 8–201, Arrington would have a right of direct appeal from the denial of his motion for new trial, if the 2008 modifications applied to his case.

The State maintains that the 2008 revisions to Section 8–201, which became effective after Arrington's appeal was filed, do not apply retroactively to his case. The State advanced this same argument in *Thompson v. State*, 411 Md. 664, 985 A.2d 32, 2009 WL 3806170 (2009), filed immediately prior hereto, in which we examined the retroactivity issue in full. There, we decided that both the more liberal right to appeal— "from an order entered under this section"—and the expansion of the grounds for a new trial should be applied retroactively because they are remedial in nature and therefore fall within the exception to the common law presumption against retroactive application of statutes. For the same reasons set forth in *Thompson*, we will apply the 2008 revisions to CP Section 8–201 to this case, and hold that we have jurisdiction to hear his appeal under the direct appeal provisions of that section.

■ The dissenting opinion introduces a new jurisdictional challenge, which depends, for its validity, on rewriting the plain words of CP Section 8–201 and Md Code (1973, 2006 Repl.Vol.), Section 12–201 of the Courts and Judicial Proceedings Article ("CJP"). Section 8–201(k)(6) accords the convicted person filing a claim under Section 8–201 the right to a direct appeal to this court. Although Section 8–201 clearly affords the claimant a right to "an appeal," the dissent erroneously avers that we cannot take the merits of this cause because we did not grant *certiorari*. The clear legislative intent that the *certiorari* process need not be followed is

demonstrated by a comparison of CJP § 12–201 (Certiorari to the Court of Special Appeals) with CP Section 8–201.

*CJP § 12–201:*

[I]n any case or proceeding pending in or decided by the Court of Special Appeals upon appeal from a circuit court . . . any party, including the State, **may file in the Court of Appeals a petition for certiorari** to review the case or proceeding." (Emphasis added.)

*CP § 8–201(k)(6):*

**"An appeal to the court of appeals may be taken from an order** entered under this section." [4]

The contrast between Section CJP § 12–201 and CP § 8–201 is striking and clearly signals the legislative intent. Certainly, the General Assembly knows how to specify that a litigant may file a petition for *certiorari;* that is not what it intended in Section 8–201(k)(6).

Moreover, this Court in adopting Maryland Rule 8–301 indicated its understanding of Section 12–201. This Rule says: "Appellate review by the Court of Appeals may be obtained only: (1) by **direct appeal** or application for leave to appeal, **where allowed by law";** . . . or (3) by writ of certiorari in all other cases. This rule informs us that the grant of *certiorari* is not necessary when the direct appeal is allowed by law. Undoubtedly, the legislature intended to allow direct appeals from CP Section 8–201 litigants. The dissent nowhere explains how Md. Rule 8–301 is consistent with its theory, nor even mentions this basic rule of procedure governing appellate review in the Court of Appeals.

There is other statutory law ignored by the dissent. The linchpin of the dissent's argument is its interpretation of CJP Section 12–307, which sets forth four categories in which this Court "has" jurisdiction or "[e]xclusive appellate jurisdiction[.]" *Id.* The dissent flatly ignores, however, the immedi-

---

4. This is from the 2008 amendments, contained in Md.Code (2001, 2008 Repl.Vol.), Crim. Pro., Section 8–201.

ately preceding and limiting section, CJP Section 12–306, which says:

> The purpose of §§ 12–307 and 12–308 of this subtitle is to allocate appellate jurisdiction between the Court of Appeals and the Court of Special Appeals. **Except as expressly provided in those sections, nothing in them creates or abrogates a right to appeal or otherwise invoke appellate jurisdiction granted by the laws of the State.**

Nothing in CJP Section 12–307 "expressly provides" that the Court of Appeals lacks jurisdiction to hear the "right to appeal" that is granted litigants who seek review after an order has been issued under CP Section 8–201. Certainly, because an "appeal to the court of appeals may be taken from" an order under CP Section 8–201, then CJP Section 12–307 cannot be interpreted as voiding that right, when the legislature explicitly disclaims any intention to "abrogat[e] a right to appeal." Nor does anything in Section 12–307 itself expressly abrogate the right to appeal granted in these sections. Moreover, when the General Assembly created Section 8–201, and modified it in 2008, it clearly relied on the existing law in Section 12–306, clarifying that nothing in Section 12–307 "abrogates a right ... to invoke appellate jurisdiction granted by the laws of the State." If it intended that the CP Section 8–201 right to appeal was to be overridden by CJP Section 12–307, it would have modified the CJP Section 12–306 "nothing abrogates" language.

For the above reasons, we conclude that the right of appeal granted in CP Section 8–201(k)(6) is a direct right of appeal to this Court, which does not require a litigant to petition for *certiorari.*

## II.

### *Scope Of Review Under The Postconviction Statute*

When Arrington's postconviction proceeding was reopened, he not only argued that he should be given a new trial because of the DNA testing results, but also on the grounds that his trial counsel was ineffective for failing to introduce a witness

statement and two police reports identifying Ray Canty as Simmons's stabber. The postconviction court determined that it would not consider that evidence because Arrington had waived the ineffective assistance of counsel issue by not raising it at his first postconviction proceeding.

On appeal, Arrington argues that "[t]he [postconviction] [c]ourt erred because it misunderstood the difference between a second successive petition and a proceeding that is reopened. Once a postconviction petition is reopened, its status is that of the initial postconviction. In other words, it is as if the postconviction proceeding was never closed." The State counters that "a reopened postconviction proceeding does not eradicate the concept of waiver, nor does it eliminate the limits placed on both the number of petitions that may be filed, or the time in which postconviction petitions may be filed."

### *Waiver*

This Court has yet to decide whether a petitioner in a reopened postconviction proceeding may raise claims that would normally be precluded under the statutory provisions about waiver in the Uniform Postconviction Procedure Act ("UPPA"), CP Sections 7–101 through 7–301 (2008 Repl.Vol.). We decide today, for the reasons explained below, that a petitioner may not assert, in a postconviction proceeding reopened under the authority of CP Section 8–201, claims that could have been, but were not, raised in the original postconviction proceeding, other than claims based on the results of the postconviction DNA testing. Our analysis starts with the statutory framework.

### *Statutory Framework*

In *Evans v. State*, 396 Md. 256, 276–77, 914 A.2d 25, 37 (2006), *cert. denied*, 552 U.S. 835, 128 S.Ct. 65, 169 L.Ed.2d 53 (2007), Judge Wilner wrote:

Maryland Code, § 7–102 of the Criminal Procedure Article (CP)—the heart of the [UPPA]—permits a convicted person to seek relief in the Circuit Court in which the conviction occurred upon an allegation that (1) the sentence

or judgment was imposed in violation of the U.S. or Maryland Constitution or laws of this State, (2) the court lacked jurisdiction to impose the sentence, (3) the sentence exceeds the maximum allowed by law, or (4) the sentence is subject to collateral attack on a ground that would otherwise be available under a writ of habeas corpus, coram nobis, or other common law or statutory remedy.

There are two important conditions to that right, however[.] The first, expressed in CP § 7–102(b)(2) and circumscribed to some extent in § 7–106, is that the alleged error "has not been previously and finally litigated or waived in the proceeding resulting in the conviction or in any other proceeding that the person has taken to secure relief from the person's conviction."

CP Section 7–106(b) contains the relevant waiver provision:

(b) *Waiver of allegation of error.*—(1)(i) Except as provided in subparagraph (ii) of this paragraph, an allegation of error is waived when a petitioner could have made but intelligently and knowingly failed to make the allegation:

1. before trial;

2. at trial;

3. on direct appeal, whether or not the petitioner took an appeal;

4. in an application for leave to appeal a conviction based on a guilty plea;

5. in a habeas corpus or coram nobis proceeding began by the petitioner;

6. **in a prior petition under this subtitle;** or

7. in any other proceeding that the petitioner began.

(ii) 1. Failure to make an allegation of error shall be excused if special circumstances exist.

2. The petitioner has the burden of proving that special circumstances exist.

(2) When a petitioner could have made an allegation of error at a proceeding set forth in paragraph (1)(i) of this subsection but did not make an allegation of error, there is a

rebuttable presumption that the petitioner intelligently and knowingly failed to make the allegation.

(Emphasis added.) Under CP Section 8–201, "if a postconviction proceeding has been previously initiated by the petitioner" and "the results of the postconviction DNA testing are favorable to the petitioner[,]" in such case, the court shall "reopen a postconviction proceeding under § 7–104 of this article[.]" CP § 8–201(i)(2). CP Section 7–104 provides that "[t]he court may reopen a postconviction proceeding that was previously concluded if the court determines that the action is in the interests of justice." The question before us is whether this "reopening" permits a petitioner to raise issues, in addition to the DNA evidence, that could have been raised "in a prior petition" under Subtitle 7.

### Prior Petition

In interpreting CP Section 7–106(b)(1)(ii)(6) we look first to the plain language of the statute. At the time of his Motion to Reopen Postconviction Proceeding and for New Trial, Arrington had already filed a petition for postconviction relief based on ineffective assistance of counsel, a claim that was resolved against him in the first postconviction proceeding.

Arrington argues that this was not a "prior petition" under Subtitle 7:

> The [postconviction court] erred because it misunderstood the difference between a second successive petition and a proceeding that is reopened. Once a postconviction petition is reopened, its status is that of the initial postconviction. In other words, it is as if the postconviction proceeding was never closed. Consequently, Arrington was entitled to raise any issue that could have been raised in the initial postconviction proceeding.

If one were to focus only on the word "reopen," this argument would have some initial appeal because the word suggests a return to the original proceeding, during which the petitioner was free to present his contentions without the restraint of Section 7–106(b)(1)(ii)(6). But, even with this limited focus,

equally appealing is the argument that a return to the original postconviction proceeding simply means that the petitioner has the right to assert the arguments he made there, plus present the new DNA evidence. When we consider the issue in the context of the overall statutory scheme regarding postconviction proceedings as set forth in the UPPA, the scales tip against Arrington's position. We explain.

The UPPA, originally enacted in 1958, "protected a broad array of rights, placed limits on collateral litigation (especially through res judicata and 'waiver' provisions), and took a step toward unifying the various collateral remedies by making the postconviction process the primary means of asserting collateral claims." Michael A. Millemann, *Collateral Remedies in Criminal Cases in Maryland: An Assessment*, 64 Md. L.Rev. 968, 991–92 (2005). Although in the original Act the number of postconviction claims a person could file was unlimited, under current law, only one is allowed—though amendments are permitted—with an opportunity to reopen "in the interests of justice." *See* CP §§ 7–103 and 7–104; Md. Rule 4–402(c). The UPPA also, in CP Section 7–106, established limits on what could be raised in a postconviction proceeding by introducing the doctrine of "waiver." The purpose of this provision was to achieve finality in the criminal adjudicative process, without unduly interfering with a defendant's right to fully present his case before a court. There is no indication that when the General Assembly enacted CP Section 8–201(i)(2) it intended to modify the important waiver provisions of Section 7–106. If it had intended such a drastic change in the statutory scheme, we think it would have expressly stated so. We are not persuaded that the mere use of the word "reopen" reveals a legislative intent to make such a change. As we see it, the legislature was focused only on expanding the opportunity to use DNA evidence, not other arguments or evidence that had been waived.

Arrington relies on *Smith v. State*, 115 Md.App. 614, 694 A.2d 182 (1997) for the proposition that the reopening of a postconviction proceeding permits a defendant to raise any issue that could have been raised in the initial postconviction

proceeding. *Smith* does not support this contention. *Smith* addressed Article 27, Section 645A(a)(2)(i) of the Maryland Code—now codified as CP Section 7–103—which stated that a **"person may file only one petition, arising out of each trial, for relief under this subtitle."** (Emphasis added.) Appellant Smith had been found in violation of his probation, resulting in its revocation.

Smith filed a petition for post conviction relief arguing (1) that the trial court "imposed the order of probation improperly, in that the court failed to comply with Maryland Rule 4–346 in not providing appellant with a written copy of the probation order" and (2) "there was no evidence to support a finding that appellant violated the conditions of probation by failing to report to his probation officer." *Id.* at 618, 694 A.2d at 184. The Circuit Court did not reach the merits on either of Smith's claims, but instead dismissed the petition on the ground that it was barred by Art. 27, § 645A(a)(2)(i). The CSA held that because the first issue arose from the original criminal proceeding, it was limited by the one petition rule. The CSA held that because the second issue arose from a probation revocation hearing, it was not part of the first "trial" and therefore Smith had not yet exhausted his one petition limit in requesting postconviction relief from that proceeding. In dictum regarding the first issue, the CSA said: "Absent a basis for reopening appellant's initial petition under § 645A(2)(iii) [now CP Section 7–104], appellant may not raise that issue now." *Id.* at 625, 694 A.2d at 187. Arrington seeks to elevate this comment into precedent for holding that whenever a post-conviction petition is reopened, the petitioner may raise any issue, even those that were considered waived under CP Section 7–106(b). *Smith* simply does not stand for this proposition, and we see nothing in that opinion that suggests the CSA was contemplating the application of its dictum to this statute.

### *The Ineffective Assistance Of Counsel Claim's Connection To The DNA Evidence*

Arrington also argues that he "was entitled to bring in new evidence to assist the fact finder in evaluating the significance

of the DNA evidence. Given that the Circuit Court stated that part of Arrington's burden was to prove his actual innocence, Arrington should have been permitted to introduce evidence on that element." This contention again brings into play our retroactive application of CP Section 8–201. In *Thompson* we held that CP Section 8–201 applied retroactively, rendering the "actual innocence" standard of Maryland Rule 4–331 inappropriate. We determined, instead, that CP Section 8–201's "substantial possibility" standard was the appropriate measure of Thompson's right to a new trial. Unlike the *Thompson* postconviction court, which reached its decision solely based on the actual innocence standard, the postconviction court here denied Arrington's motion for a new trial on two independent grounds: (1) that Arrington was not actually innocent based on Maryland Rule 4–331 and (2) that there was no substantial possibility that DNA evidence would have changed the verdict.

Because we have rejected the actual innocence standard, we only review the validity of the postconviction court's alternate holding based on the substantial possibility standard. This approach forecloses Arrington's argument that Maryland Rule 4–331 requires admission of additional non-DNA evidence of his actual innocence that he offers post-trial. Since he need not establish "actual innocence," there is no need to consider that evidence in applying the "substantial possibility" standard.

### III.

#### *The Postconviction Court's Finding That Newly Discovered DNA Evidence Would Not Have Affected the Verdict*

Arrington argues that "[t]he postconviction court erred by concluding that the newly discovered DNA evidence would not have affected the verdict." He offers the following in support of his argument:

- The jury note establishes that the jury considered the misleading scientific evidence during deliberations;

- Juries give heavy weight to scientific evidence;
- The misleading scientific evidence weakened the defense theory of the case and arguments;
- The State's case was substantially diminished through cross-examination and was not overwhelming; and
- The postconviction court imposed a requirement not set forth in the statute or rule.

The State counters:

There were multiple eyewitnesses to the murder, and several people reported hearing Arrington gloat about the stabbing afterwards. The jury was not presented with any false information about the bloodstain. The State did not even reference the blood evidence in its closing argument to the jury.

### *Standard Of Review*

We "will not disturb the factual findings of the post-conviction court unless they are clearly erroneous." *Wilson v. State,* 363 Md. 333, 348, 768 A.2d 675, 683 (2001). "Although reviewing factual determinations of the post-conviction court under a clearly erroneous standard, we make an independent determination of relevant law and its application to the facts." *State v. Adams,* 406 Md. 240, 255, 958 A.2d 295, 305 (2008), *cert. denied,* — U.S. ——, 129 S.Ct. 1624, 173 L.Ed.2d 1005 (2009).

"The question whether to grant a new trial is within the discretion of the trial court. Ordinarily, a trial court's order denying a motion for a new trial will be reviewed on appeal if it is claimed that the trial court abused its discretion." *Cooley v. State,* 385 Md. 165, 175, 867 A.2d 1065, 1071 (2005) (citation and internal quotation marks omitted). In *Gray v. State,* 388 Md. 366, 383–84, 879 A.2d 1064, 1073–74 (2005), we elaborated on the abuse of discretion standard as follows:

Abuse of discretion is one of those very general, amorphous terms that appellate courts use and apply with great

frequency but which they have defined in many different ways.... [A] ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable. That kind of distance can arise in a number of ways, among which are that the ruling either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective. That, we think, is included within the notion of "untenable grounds," "violative of fact and logic," and "against the logic and effect of facts and inferences before the court."

(Citations and internal quotation marks omitted.) Of course, the court's discretion is always tempered by the requirement that the court correctly apply the law applicable to the case.

 Arrington and the State agree that the appropriate standard for the postconviction court to employ in reviewing whether the DNA evidence warrants a new trial is whether a substantial possibility exists that the petitioner would not have been convicted if the DNA testing results had been known or introduced at trial. *See* CP § 8–201(i)(2)(iii). We are of the same view. *See Thompson*, 411 Md. at 678, 985 A.2d at 40, 2009 WL 3806170 (2009).

### The Jury Notes

 Arrington contends that the postconviction court's conclusion that the misleading serology had "minimal" effect on the jury "ignored the fact that the jury wrote a note specifically raising a question about the bloodstain evidence." In a recent case, we examined the value of jury notes as a tool to assess the impact that improper evidence had on the jury. *See Hunter v. State*, 397 Md. 580, 597, 919 A.2d 63, 72–73 (2007). In *Hunter*, we were asked to determine whether it was error to allow the prosecutor to ask the defendant whether the police witnesses were lying. We determined that the prejudicial effect of "were-they-lying" questions was "demon-

strated by the number and the combination of the questions themselves, the repeated emphasis on them during the State's closing argument, and, **most importantly, the jury's behavior during its deliberations.**" *Id.,* 919 A.2d at 72 (emphasis added). We discussed the impact of jury notes:

> The jury sent four notes to the trial court. Three asked for additional information or clarification of certain information. One of the questions related to the pawnshop ticket and may have been related to a concern the jury had about the truthfulness of petitioner's testimony that he had pawned the ring for a friend. Another related to whether the petitioner had signed a confession, which may have been referring to the conflict between the officers' and the petitioner's testimony in respect to whether he had confessed and, thus, this jury question may have directly related to the "were-they-lying" questions. The jury's question, in respect to possession of stolen property, may have related to a juror's concern that by pawning the stolen property for a friend, the petitioner must have assumed that the property was stolen. Additionally, the jury sent one note telling the trial judge that they doubted their ability to reach a unanimous verdict. We are unable to say, beyond a reasonable doubt, that the jury was not affected by the "were-they-lying" questions. Therefore, the trial court's error in allowing the questions was not harmless.

*Id.,* 919 A.2d at 72–73. As we did in *Hunter,* here we take seriously the written communications from the jury to the judge in assessing the impact of certain evidence on their deliberative process.

The chronology of jury questions in this case is as follows. After several hours of deliberation, the jury sent a note asking three questions. The first question was what questions were asked of the witnesses during the photo identification process; the trial judge responded, "Your recollection of the testimony will govern." The jury also requested copies of the statements witnesses gave to the police and grand jury and a copy of Richard Antiguas's statement. The judge informed the jury

that they had everything entered into evidence including the statement.

During the following day's deliberations, the jury sent the note requesting clarification of the serology report:

[The Court]: Counsel, I have a message from the jury which reads as follows:

"Judge Pincus, The jury has a question regarding the penciled 59 percent next to stain no. 1 on the waste band of the defendant's sweat pants." And they are referring to the forensic supplemental report, marked State's Exhibit No. 22.

The question is: "Does 59 percent of the population have matching PGM 1?"

My answer will be: "You must rely on your own collective recollection of the evidence in this case."

The questions asked by the jury here suggest that the jurors took seriously the prejudicial serology evidence now called into question by conflicting DNA evidence. *See Clemons v. State,* 392 Md. 339, 372, 896 A.2d 1059, 1078 (2006) (internal quotations marks and citation omitted) (stating that "[l]ay jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials").

The State maintains that it did not claim, through its expert, any greater degree of precision or reliability in the blood typing evidence than the testing procedures allowed for and did not refer to the blood evidence at all in its closing. This is correct. The State did, however, make the following statement during its opening argument:

Now, there is more to this case, however, than just the eyewitnesses that you are going to hear from because there is also going to be what is called forensic evidence. And by that, let me specifically say what I mean.

When the defendant was arrested several days later, he was wearing the same clothes that he was wearing the night that the killing occurred. And when he was arrested, the police in examining his clothing realized that there were what appeared to be dried bloodstains on his pants.

And the police seized those pants and had them analyzed and compared to the victim's blood by someone from the crime laboratory. And the person from the crime laboratory will testify and tell you that that blood on the defendant's clothing is the same blood type as the blood that was the victim's blood.

The prosecutor's statement clearly indicated that the blood evidence would be a critical component of the State's case against Arrington. Realizing that opening statements are the first characterization of the case heard by the jury and often presented in artful form, we do not underestimate the ultimate impact of these statements on the jury's verdict. Suffice it to say, the State's silence on this point in closing argument did not eradicate from the jury's mind what the prosecutor promised to them at the beginning. This is especially so when the promised (although faulty) evidence of the victim's blood on Arrington's pants was produced during the trial.

The State also relies on *Shanks v. State,* 185 Md. 437, 445, 45 A.2d 85, 88 (1945), because that case affirmed the admission of serology evidence that type O blood found on Shanks's coat matched that of a rape victim, even though 45 percent of the population has type O blood. *Shanks* does not advance the State's cause—the admissibility of traditional serology evidence is not at issue in this appeal. The issue is whether the new DNA evidence, which contradicted the serology evidence admitted at trial, met the "substantial possibility" test of CP Section 8–201, and whether the lower court erred in concluding otherwise.

The jury's keen awareness of the serology evidence that is revealed by its notes cannot be ignored. The jury's focus on that evidence, and the flat contradiction of the State's serology evidence shown by the DNA evidence, persuade us that there is a "substantial possibility" that Arrington would not have been convicted if the DNA evidence had been introduced at trial. *See* CP § 8–201(i)(2)(iii). Indeed, we also conclude that the postconviction court's conclusion to the contrary is "against the logic and effect of [the] facts and inferences before the court" and "well removed from any center mark[,]"

and therefore constitutes an abuse of discretion. *See Gray,* 388 Md. at 383–84, 879 A.2d at 1073–74 (explaining abuse of discretion standard). Accordingly, we vacate the postconviction court's order, and remand to the Circuit Court for a new trial.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY VACATED AND CASE REMANDED FOR NEW TRIAL. COSTS TO BE PAID BY MONT-GOMERY COUNTY.**

BATTAGLIA and GREENE, JJ., Dissent.

Dissenting Opinion by BATTAGLIA, J., which GREENE, J., Joins.

I respectfully dissent because the majority reaches the merits of the case, although we never granted certiorari.

Arrington filed a "Motion to Reopen Postconviction Proceeding and For New Trial" pursuant to former Section 8–201 of the Criminal Procedure Article, Maryland Code (2001, 2008 Repl.Vol.),[1] after a DNA test reflected that blood on clothing that he owned could not have come from the victim, alleging that he was entitled to a new trial for the crime of second degree murder for which he had been convicted because the jury was misled into believing that the scientific evidence presented at trial was inculpatory, because there was a significant likelihood that he would not have been convicted if the DNA evidence had been available at the time of his trial, and because his trial attorney was ineffective. Judge Katherine Savage held a hearing on the motion and ordered "that

---

1. All references to the Criminal Procedure Article are to Maryland Code (2001, 2008 Repl.Vol., 2009 Supp.), unless otherwise noted. The 2008 Replacement Volume includes three versions of Section 8–201, and the 2009 Supplement includes two versions of Section 8–201. We use the word "former" to refer to the first alliteration of Section 8–201, which was enacted in 2001 and amended in 2002, 2003, and 2004. We use the word "amended" to refer to the second version of Section 8–201, which was amended by Chapter 337 of the Maryland Laws of 2008, and became effective January 1, 2009. The third version of Section 8–201 becomes effective December 31, 2013.

[Arrington's] Motion to Reopen Postconviction Proceeding (DE # 216) is hereby **GRANTED IN PART** and **DENIED IN PART—DENIED** as to the ineffective assistance of counsel claim; **GRANTED** as to the newly discovered DNA evidence; and it is further **ORDERED** that [Arrington's] Motion for a New Trial (DE # 217) is hereby **DENIED**." (emphasis in original). Thereafter, Arrington filed with the Court of Special Appeals an Application for Leave to Appeal, a Notice of Appeal to the Court of Special Appeals, and a Notice of Appeal to the Court of Appeals.

The Court of Special Appeals thereafter denied Arrington's Application for Leave to Appeal, but six months later, on its own initiative, ordered Arrington's counsel to show cause why it should not dismiss the direct appeal to the Court of Special Appeals, stay the direct appeal to the Court of Special Appeals, and/or transfer the matter to the Court of Appeals for further proceedings "upon direct appeal" to the Court of Appeals. Arrington filed a response arguing that the court should transfer the case to the Court of Appeals to be handled as a direct appeal pursuant to Section 8–201(j)(6) of the Criminal Procedure Article. Thereupon, the Court of Special Appeals purportedly transferred the case to this Court:

ORDERED, pursuant to Maryland Rule 8–132 and CP § 8–201(j)(6), that [Arrington's] April 5, 2007 notice of appeal to the Court of Appeals in the above-captioned action is hereby transferred to the Court of Appeals of Maryland; and, it is further

ORDERED that, pending the conclusion of proceedings in the Court of Appeals on the matter being transferred, all further proceedings in this Court are hereby STAYED concerning (a) [Arrington's] April 5, 2007 direct appeal to this Court, (b) [Arrington's] April 5, 2007 application for leave to appeal to this Court.

We, however, were not presented with a petition for certiorari in this case, unlike that which we granted in *Thompson v. State*, 395 Md. 240, 909 A.2d 1035 (2006). The majority, in treating the present case as identical to *Thompson*, however,

has failed to acknowledge the difference between our exclusive jurisdiction, when the Legislature mandates that we take a case on direct appeal, and our discretionary jurisdiction, when we may take an appeal, either before or after the Court of Special Appeals has acted. Our jurisdiction in cases such as the present under Section 8–201 can only be exercised under a certiorari grant, which did not occur in the present case.

Our jurisdiction to entertain a case is wholly statutory, and our ability to entertain an appeal must be legislatively granted.[2] *See Rogers v. Eastport Yachting Ctr., LLC,* 408 Md. 722, 732, 971 A.2d 322, 328 (2009); *Fuller v. State,* 397 Md. 372, 382, 918 A.2d 453, 459 (2007); *Pack Shack, Inc. v. Howard County,* 371 Md. 243, 247, 808 A.2d 795, 797 (2002); *Prince George's County v. Beretta U.S.A. Corp.,* 358 Md. 166, 173, 747 A.2d 647, 651 (2000); *Gisriel v. Ocean City Bd. of Supervisors of Elections,* 345 Md. 477, 485, 693 A.2d 757, 761 (1997), *cert. denied,* 522 U.S. 1053, 118 S.Ct. 702, 139 L.Ed.2d 645 (1998). In 1966, a constitutional amendment added Section 14A to Article IV of the Constitution[3] providing the Legislature with a general grant of power to "create such intermediate courts of appeal, as may be necessary" and to "prescribe the intermediate appellate jurisdiction of these courts of appeal, and all other powers necessary for the operation of such courts." In *Department of Human Resources v. Howard,* 397 Md. 353, 918 A.2d 441 (2007), Judge Harrell explicated the "genesis" of the Court of Special Appeals:

---

**2.** "Appellate jurisdiction" is defined in Section 12–101 of the Courts and Judicial Proceedings Article, Maryland Code (1973, 2006 Repl. Vol.), as "jurisdiction exercised by an appellate court." An "appellate court" is defined in the same subsection as "any court which reviews a final judgment of another court, and includes any court authorized to enter judgment following a de novo trial on appeal of a case or proceeding previously tried in another court."

**3.** Section 14A of Article IV of the Constitution provides:

The General Assembly may by law create such intermediate courts of appeal, as may be necessary. The General Assembly may prescribe the intermediate appellate jurisdiction of these courts of appeal, and all other powers necessary for the operation of such courts.

Creation of the Court of Special Appeals was authorized by a constitutional amendment approved by the General Assembly on 23 March 1966 and ratified by the electorate on 8 November 1966 as Article IV, § 14A of the Maryland Constitution, which bestowed on the Legislature the power to "create such intermediate courts of appeal, as may be necessary" by statute and prescribe their jurisdiction and powers. Chapter 10, § 1 of the Acts of 1966. Pursuant to that constitutional amendment, the General Assembly created, by statute, the Court of Special Appeals as the second ever intermediate appellate court in Maryland. Chapter 11, § 1 of the Acts of 1966 (codified at Md.Code (1957, 1966 Repl.Vol.), Art. 26, § 130 and recodified at Cts. & Jud. Proc. Article, § 1–401). At the time of its nativity, the intermediate appellate court's jurisdiction was limited to criminal matters involving sentences other than death. Md.Code (1957, 1966 Repl.Vol.), Art. 26, § 130. The court was composed of only five members, hearing and deciding cases as a full court at that time. *Id.* Four years later, however, the General Assembly expanded the Court of Special Appeals's jurisdiction to include certain civil matters, concomitantly increasing its size to nine members hearing cases in panels of no less than three judges. Chapter 99, § 1 of the Acts of 1970. Along with the expansion, the Legislature empowered the court to hear and decide cases in banc by a majority vote of the judges of the court. *Id.* Within the ensuing seven years, the size of the intermediate appellate court was expanded on three more occasions: to 10 judges in 1973, 12 judges in 1974, and to the now familiar number of 13 judges in 1977.

*Id.* at 360–61, 918 A.2d at 445–46 (footnotes omitted). The purpose for the creation of the Court of Special Appeals was to "relieve [the Court of Appeals] of the substantial increase of criminal appeals which had inundated the Court and yet provide at least one appeal as of right...." *Walston v. Sun Cab Co.,* 267 Md. 559, 565, 298 A.2d 391, 395 (1973). Presently, the Court of Special Appeals has "exclusive initial appellate jurisdiction over any reviewable judgment, decree, order or

other action of a circuit court, and an orphans' court." Section 12–308 of the Courts and Judicial Proceedings Article, Maryland Code (1973, 2006 Repl.Vol.).[4] Our jurisdiction is defined in Sections 12–301 [5] and 12–307 [6] of the Courts and Judicial Proceedings Article for the review of "final" and "reviewable" judgments. Without a grant of jurisdiction from the Legislature, we are powerless to review the judgment of a lower court, and parties cannot confer jurisdiction by consent. *Rush v. State*, 403 Md. 68, 97–99, 939 A.2d 689, 705–07 (2008) (recounting our long history of narrowly construing our appellate authority).

---

**4.** Section 12–308 of the Courts and Judicial Proceedings Article provides:

Except as provided in § 12–307 of this subtitle, the Court of Special Appeals has exclusive initial appellate jurisdiction over any reviewable judgment, decree, order or other action of a circuit court, and an orphans' court.

All references to the Courts and Judicial Proceedings Article are to Maryland Code (1973, 2006 Repl.Vol.), unless otherwise noted.

**5.** Section 12–301 of the Courts and Judicial Proceedings Article provides:

Except as provided in § 12–302 of this subtitle, a party may appeal from a final judgment entered in a civil or criminal case by a circuit court. The right of appeal exists from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law. In a criminal case, the defendant may appeal even though imposition or execution of sentence has been suspended. In a civil case, a plaintiff who has accepted a remittitur may cross-appeal from the final judgment.

**6.** Section 12–307 of the Courts and Judicial Proceedings Article provides:

The Court of Appeals has:

(1) Jurisdiction to review a case or proceeding pending in or decided by the Court of Special Appeals in accordance with Subtitle 2 of this title;

(2) Jurisdiction to review a case or proceeding decided by a circuit court, in accordance with § 12–305 of this subtitle;

(3) Exclusive appellate jurisdiction with respect to a question of law certified to it under the Uniform Certification of Questions of Law Act; and

(4) Exclusive appellate jurisdiction over a criminal case in which the death penalty is imposed and any appellate proceeding under § 3–904 of the Correctional Services Article.

The certiorari process generally defines how we reach a case. *See* Sections 12–201, 12–305, and 12–307 of the Courts and Judicial Proceedings Article.[7] The purpose of the process is to enable us to control our caseload by accepting only those cases that have substantial precedential value or are "desirable and in the public interest. . . ." Section 12–203 of the Courts and Judicial Proceedings Article.[8] Conversely, there are situations in which a certiorari petition is not necessary and our exclusive jurisdiction mandates that we entertain an individual's appeal. We are commanded to hear appeals of a

---

7. Section 12–201 of the Courts and Judicial Proceedings Article provides:

> Except as provided in § 12–202 of this subtitle, in any case or proceeding pending in or decided by the Court of Special Appeals upon appeal from a circuit court or an orphans' court or the Maryland Tax Court, any party, including the State, may file in the Court of Appeals a petition for certiorari to review the case or proceeding. The petition may be filed either before or after the Court of Special Appeals has rendered a decision, but not later than the time prescribed by the Maryland Rules. In a case or proceeding described in this section, the Court of Appeals also may issue the writ of certiorari on its own motion.

> Section 12–305 of the Courts and Judicial Proceedings Article provides:

> The Court of Appeals shall require by writ of certiorari that a decision be certified to it for review and determination in any case in which a circuit court has rendered a final judgment on appeal from the District Court or has rendered a final judgment on appeal from an administrative decision under Title 16 of the Transportation Article if it appears to the Court of Appeals, upon petition of a party that: (1) Review is necessary to secure uniformity of decision, as where the same statute has been construed differently by two or more judges; or (2) There are other special circumstances rendering it desirable and in the public interest that the decision be reviewed.

8. Section 12–203 of the Courts and Judicial Proceedings Article provides in pertinent part:

> If the Court of Appeals finds that review of the case described in § 12–201 of this subtitle is desirable and in the public interest, the Court of Appeals shall require by writ of certiorari that the case be certified to it for review and determination. The writ may issue before or after the Court of Special Appeals has rendered a decision. The Court of Appeals may by rule provide for the number of its judges who must concur to grant the writ of certiorari in any case, but that number may not exceed three. Reasons for the denial of the writ shall be in writing.

convicted person upon whom the death penalty has been imposed, *see* Section 2–401(d) of the Criminal Law Article, Maryland Code (2002, 2009 Supp.) ("In addition to any error properly before the Court on appeal, the Court of Appeals *shall* consider the imposition of the death sentence.") (emphasis added); Section 12–307(4) of the Courts and Judicial Proceedings Article ("The Court of Appeals has ... [e]xclusive appellate jurisdiction over a criminal case in which the death penalty is imposed...."). We also have exclusive appellate jurisdiction in reviewing circuit court decisions approving transfers of assets of savings and loan associations, *see* Section 9–712(d)(2) of the Financial Institutions Article, Maryland Code (1980, 2003 Repl.Vol.) ("Notwithstanding any other provision of law, the Court of Appeals *shall* have exclusive and plenary jurisdiction over an appeal of any order of a State court approving a transaction under subsection (b) or (c) of this section.") (emphasis added); the legislative districting of the State that occurs after each Census, *see* Maryland Constitution, Article III Section 5 ("Upon petition of any registered voter, the Court of Appeals *shall* have original jurisdiction to review the legislative districting of the State and may grant appropriate relief, if it finds that the districting of the State is not consistent with requirements of either the Constitution of the United States of America, or the Constitution of Maryland.") (emphasis added); and reviewing circuit court decisions regarding contested elections, *see* Section 12–203(a)(3) of the Election Law Article, Maryland Code (2003) ("A proceeding under this subtitle shall be conducted in accordance with the Maryland Rules, except that ... an appeal *shall* be taken directly to the Court of Appeals within 5 days of the date of the decision of the circuit court.") (emphasis added). In each situation, the Legislature has mandated that the appeal "shall" be taken to this Court, which is not the case in the post-conviction DNA area, where the language of the statute provides, "An appeal to the court of appeals may be taken from an order entered under this section." Section 8–201(k)(6) of the Criminal Procedure Article.

Juxtaposed against the exercise of our exclusive jurisdiction and power to entertain appeals through the certiorari process is the exercise of our jurisdiction in traditional post-conviction cases in which convicted persons, who are still incarcerated, on parole, or on probation, have the ability under the Maryland Uniform Post Conviction Procedure Act to collaterally attack a judgment by challenging alleged constitutional, jurisdictional, or other fundamental violations that occurred at trial. *See* Section 7–102 of the Criminal Procedure Article, Maryland Code (2001, 2008 Repl.Vol.);[9] *Mosley v. State,* 378 Md. 548, 559–60, 836 A.2d 678, 684–85 (2003) (explaining that a post-conviction proceeding is the most appropriate way to raise the claim of ineffective assistance of counsel), citing *Maryland State Bar Ass'n v. Kerr,* 272 Md. 687, 689–90, 326 A.2d 180, 181 (1974) (explaining that a post-conviction proceeding in Maryland does not constitute a part of the original criminal cause, but is an independent and collateral civil inquiry into the validity of the conviction and sentence) (quotations omitted).[10]

---

**9.** Section 7–102 of the Criminal Procedure Article provides:
(a) *In general.*—Subject to subsection (b) of this section, §§ 7–103 and 7–104 of this subtitle and Subtitle 2 of this title, a convicted person may begin a proceeding under this title in the circuit court for the county in which the conviction took place at any time if the person claims that:
(1) the sentence or judgment was imposed in violation of the Constitution of the United States or the Constitution or laws of the State;
(2) the court lacked jurisdiction to impose the sentence;
(3) the sentence exceeds the maximum allowed by law; or
(4) the sentence is otherwise subject to collateral attack on a ground of alleged error that would otherwise be available under a writ of habeas corpus, writ of coram nobis, or other common law or statutory remedy.
(b) *Requirements to begin proceeding.*—A person may begin a proceeding under this title if:
(1) the person seeks to set aside or correct the judgment or sentence; and
(2) the alleged error has not been previously and finally litigated or waived in the proceeding resulting in the conviction or in any other proceeding that the person has taken to secure relief from the person's conviction.

**10.** For a history of the Maryland Uniform Post Conviction Procedure Act, *see Gluckstern v. Sutton,* 319 Md. 634, 658, 574 A.2d 898, 909

In a traditional post-conviction case, when an inmate's petition for relief under the Maryland Uniform Post Conviction Procedure Act is denied by a circuit court, he or she must file an Application for Leave to Appeal in the Court of Special Appeals. *See* Section 7–109 of the Criminal Procedure Article, Maryland Code (2001, 2008 Repl.Vol.); [11] *Coleman v. Warden,* 239 Md. 711, 712, 212 A.2d 463, 463 (1965) ("[N]o appeal as of right lies from the denial of post conviction relief; review may be sought only by way of an application for leave to appeal."); *Bulluck v. Warden,* 220 Md. 658, 659, 152 A.2d 184, 184 (1959) ("It is not one of the purposes of the Post Conviction Procedure Act to grant an additional and fully repetitious appeal."). If the Court of Special Appeals summarily denies the Application, we are not empowered to entertain a review of the denial or grant. *See* Section 12–202 of the Courts and Judicial Proceedings Article.[12] *See also Grayson v. State,* 354 Md. 1, 12, 728 A.2d 1280, 1285 (1999); *Cianos v. State,* 338 Md. 406, 407, 659 A.2d 291, 292 (1995); *Sherman v. State,* 323 Md. 310,

---

(1990) ("The purpose of the Post Conviction Procedure Act was to create a simple statutory procedure, in place of the common law *habeas corpus* and *coram nobis* remedies, for collateral attacks upon criminal convictions and sentences."); *Smith v. State,* 115 Md.App. 614, 622, 694 A.2d 182, 186 (1997) ("When the Post Conviction Procedure Act first was adopted in 1958, it was intended to supplant the then existing remedies of *habeas corpus* and *coram nobis.''),* citing Edward A. Tomlinson, *Post–Conviction in Maryland: Past, Present and Future,* 45 Md. L.Rev. 927, 932–35 (1986); *see also* Michael A. Millemann, *Collateral Remedies in Criminal Cases in Maryland: An Assessment,* 64 Md. L.Rev. 968 (2005).

11. Section 7–109 of the Criminal Procedure Article provides in pertinent part:

(a) *Application.*—Within 30 days after the court passes an order in accordance with this subtitle, a person aggrieved by the order, including the Attorney General and a State's Attorney, may apply to the Court of Special Appeals for leave to appeal the order.

12. Section 12–202 of the Courts and Judicial Proceedings Article provides in pertinent part:

A review by way of certiorari may not be granted by the Court of Appeals in a case or proceeding in which the Court of Special Appeals has denied or granted:

(1) Leave to prosecute an appeal in a post conviction proceeding.

311, 593 A.2d 670, 670 (1991) *vacated in part on other grounds*, 1991 Md. LEXIS 197 (1991); *Williams v. State*, 292 Md. 201, 208–11, 438 A.2d 1301, 1304–05 (1981). Only when an Application for Leave to Appeal is granted and the merits reached by the Court of Special Appeals can we entertain the case, and only then after the grant of a petition for certiorari.[13]

This traditional process was altered in 2001 in cases in which DNA may be involved, however, when the Legislature enacted the DNA Post Conviction Act for the purpose of authorizing persons convicted of manslaughter, murder in any degree, or first or second degree rape or sexual offense to file a petition for postconviction DNA testing of certain evidence under certain circumstances. The DNA Post Conviction Act, as codified in Section 8–201 of the Criminal Procedure Article, gives various incarcerated persons the opportunity to file a petition for DNA testing "[n]otwithstanding any other law governing postconviction relief." This, however, did not mandate that we entertain DNA cases on an exclusive basis, before any direct appeal to the Court of Special Appeals. The statute, rather, eliminated the Application for Leave to Appeal process in the Court of Special Appeals, thereby streamlining the DNA process to appeal in the Court of Special Appeals from which an inmate "may" appeal to our Court. The Legislature did not mandate that we entertain each case, as it has done in the past, using explicit "shall" language.[14] Rather,

---

**13.** In *Williams v. State*, 292 Md. 201, 208–11, 438 A.2d 1301, 1304–05 (1981), we held that once the Court of Special Appeals granted leave to appeal in a post-conviction case and rendered a decision on the merits, we had jurisdiction under Section 12–201 of the Courts and Judicial Proceedings Article to grant certiorari and review the Court of Special Appeals' decision. We reaffirmed our holdings in *Jourdan v. State*, 275 Md. 495, 341 A.2d 388 (1975) and *Moss v. Director*, 279 Md. 561, 369 A.2d 1011 (1977), in which we held that the limitation upon our Court's jurisdiction set forth in Section 12–202 of the Courts and Judicial Proceedings Article related only to the action of the Court of Special Appeals in granting or denying an application for leave to appeal and not that court's decision on the merits. *Id.* at 210–11, 438 A.2d at 1305.

**14.** The majority claims that Rule 8–301 supports its contention that our certiorari process need not be followed when a "direct appeal" is

the permissive language of amended Section 8–201(k)(6) of the Criminal Procedure Article, which states that "[a]n appeal to the court of appeals may be taken from an order entered under this section," does not obviate Court of Special Appeals jurisdiction but, rather, permits a defendant to file a direct appeal to the Court of Special Appeals rather than file an Application for Leave to Appeal, and thereafter permits the review by this Court through the certiorari process, which was not invoked in the present case.[15]

When the DNA post-conviction court denied a new trial, Arrington chose to pursue the traditional post-conviction appellate route. He did not file a petition for writ of certiorari with us, as he could have done pursuant to Section 8–201(k)(6). He chose instead to file an Application for Leave to Appeal with the Court of Special Appeals and then a direct appeal, which the Court of Special Appeals must entertain. Our exercise of jurisdiction should await another day, if "desirable and in the public interest."

Judge GREENE has authorized me to state that he joins in the views expressed in this dissenting opinion.

-----

allowed by law, thereby conflating direct appeal with exclusive jurisdiction. The Rule, however, does not inform the process in a DNA case. Where the Legislature has mandated our exercise of exclusive jurisdiction, whereby the Court of Special Appeals is totally bypassed and we must take the case, it has done so explicitly, not as was done here.

15. Even when we have granted certiorari, we have dismissed cases or declined to reach the merits upon finding we had no jurisdiction. *See, e.g., Laurel Racing Ass'n, Inc. v. Video Lottery Facility Location Comm'n,* 409 Md. 445, 469, 975 A.2d 894, 908 (2009) (dismissed for failure to exhaust administrative remedies); *Maryland Dep't of the Env't v. Klein/Wachter Props., LLC,* 408 Md. 230, 230, 969 A.2d 277, 277 (2009) (dismissed for mootness); *Ochs v. Hayward,* 407 Md. 231, 231, 964 A.2d 649, 649 (2009) (dismissed for improvidently granting certiorari); *Safety Nat'l v. State,* 403 Md. 302, 303, 941 A.2d 1102, 1103 (2008) (dismissed pursuant to Rule 8–504(c) for appellant's failure to properly prepare brief in compliance with Rule 8–504(a)(5)); *Holbrook v. State,* 364 Md. 354, 375, 772 A.2d 1240, 1252 (2001) (dismissed third argument in brief for failure to preserve pursuant to Rule 8–131(b)).